409 A.2d 544.

STATE *vs.* FRANK L. MARRAPESE, JR..

DECEMBER 20, 1979.

PRESENT: Kelleher, Doris and Weisberger, JJ.

KELLEHER, J. This opinion might be entitled, "Bobo Revisited." Frank L. Marrapese, Jr.'s nickname is Bobo. In *State* v. *Marrapese*, 116 R.I. 1, 351 A.2d 95 (1976), we denied Bobo's appeal after a jury had found him guilty of two charges: (1) that he had received stolen goods and (2) that he had conspired with James R. Harris and Harry L. Glantz to steal a camper. The vehicle was going to be used to transport

Bobo and his girl friend, Vivian, to Florida where the couple could spend some time soaking up the sun. When Bobo told Vivian that the trip and their romance were off, Vivian went to the state police and informed them of both the location of the stolen camper and the identity of the thieves. Following his conviction, Bobo received a 3-year prison sentence on the stolen-goods charge and a suspended sentence of 6 years on the conspiracy charge. The suspended sentence carried with it a period of years during which Bobo was on probation. He is now before us on his appeal from a June 21, 1978 imposition of the 6-year sentence. The sentence was imposed after a Superior Court justice determined that Bobo had violated his probationary status.

One of the prosecution witnesses at the violation hearing was Bobo's former friend and co-conspirator, James R. Harris (Harris), who described Bobo's involvement in a stolen-car ring. This operation was centered in Providence but catered to customers in such far-away places as Pennsylvania. Harris, an admitted participant in the operation, was an informant in the employ of the Federal Bureau of Investigation (FBI).

Harris told the trial justice that in January 1977 Bobo called him and not only offered to sell him counterfeit automobile title certificates but subsequently also announced that he, Bobo, was now marketing stolen cars whose serial numbers matched those on the certificates. The purchase price for such items was $2,500 each. Harris then contacted the FBI and told the agency of Bobo's offer. For its part, the FBI agreed to pay Harris, aid in his relocation, and give him immunity for his stolen-car activities. In turn, Harris promised to forward all pertinent information to the FBI.

To implement this agreement, Harris contacted Bobo and told him that he had a buyer who needed a car and a bogus title certificate. This conversation led to a meeting in Harris' Coventry home. Present at that time were Bobo; one of Bobo's acquaintances, Allie BiFalco; and Ernie DeFusco, who was representing the buyer. Bobo told Harris and

DeFusco that BiFalco was the individual to contact should they have any question as to the impending sale. About 10 days later, Harris supplied the FBI with a copy of a false title certificate.

During the first week in March 1977, Harris picked up a 1976 brown Cadillac Coupe de Ville in New York[1] and delivered it to a customer in Hershey, Pennsylvania. The purchase price was $5,500. The price included the car, the bill of sale, and the title certificate. Although Harris described this sale as being strictly a cash transaction, the record indicates that the customer paid by a check made payable to a "Steven Rackman." An FBI agent who testified at the hearing attempted to explain this discrepancy by stating that Harris had told the agent that he was "Rackman" and that he had cashed the check. When Bobo's attorney inquired why a check supposedly presented to the bank on March 4 had a stamp on its back which carried a March 7 date, the agent explained to the trial justice that the buyer had told him the check was presented late in the afternoon of Friday, March 4, at a time when the bank was recording all transactions occurring at that time as having taken place on Monday, March 7.

After the first sale, Harris, with the encouragement of the FBI, told Bobo that he was in the market for a second vehicle. Bobo informed Harris that the price was going up. Subsequently, in mid-April, BiFalco phoned Harris to instruct him where the automobile could be picked up, but Harris indicated that he wished to confirm the deal with Bobo. BiFalco then responded, "I'm with Bobo now, I'll set the whole thing up." Harris recorded this conversation with the aid of a device which the FBI had attached to his phone and turned the tape over to the FBI. At the hearing, both the agent and Harris identified the voice on the tape as being that of BiFalco. This tape and a subsequent tape of a conversation between Harris and Bobo were admitted into evidence.

---

[1] Harris' New York contact was BiFalco's brother, Tom.

Bobo might be called an entrepreneur because when he testified, he described himself as an asphalt-paving contractor and the owner and operator of a clothing store situated on Atwells Avenue in Providence. According to Bobo, his clothing specialty in the winter of 1977 was a line of leather jackets that he purchased wholesale for $30 and was selling retail for $50. Bobo explained to the trial justice that he had "flooded two neighborhoods" with the jackets and gave the surplus to Harris so that Harris could try his luck in Coventry. At the trial Bobo conceded that the tape was a recording of a conversation that he had with Harris on April 19, 1977, but claimed they were talking about the price Harris had to pay Bobo for each of the jackets he sold to his Coventry clientele.

However, the state maintained the tape concerned a conversation that took place after Harris had agreed to set up a sale of a car to an undercover agent called Billy Wells. Harris testified that in mid-April he returned to New York and picked up a 1976 red-and-white Coupe de Ville and ultimately delivered it to Wells in East Providence. The selling price for the two-tone vehicle was $6,000. Harris arrived in Rhode Island with the car on the week-end and stored it during this period in his own garage. Delivery was made to Wells during the next week, and payment was delayed until such time as Wells received the necessary cash from the federal government. The state insisted that the April 19, 1977 conversation actually related to the delay in the payment and the ultimate division of its proceeds.

On the tape, after exchanging pleasantries, Harris assured Bobo that he was "either gonna take care of that tonight or by noontime tomorrow, one way or the other it's cool." Bobo replied, "[W]ell see if you can get it tonight." After Harris had assured him that he was "trying," Bobo countered, "Alright, you know what you're gonna give me, right?" Harris answered, "Yeah." Bobo responded, "Three two. Thirty two." Harris said, "You got it," and also asked, "[D]o you want me to just call you when it comes and say come

over the house?" Bobo made it clear that there was no need for speed, but when Harris asked, "[C]an I give you three one * * * and then give you another one the next time," Bobo insisted, "It's gotta be three two."

Bobo maintained that his conference reference to "Three two" or "thirty two" merely meant that he was satisfied by Harris' paying him $32 for each jacket Harris sold. He explained that he was pleased with the small $2 markup because the season was just about over, and he had made enough profits on the jackets that carried the $50 price tags. The trial justice, however, found that the conversation related to stolen cars rather than leather jackets and the "Three two" concerned Bobo's share of the $6,000, to wit, $3,200.[2]

The first facet of Bobo's appeal concerned the prosecution's reliance on and use of hearsay evidence, specifically: (1) Harris' report of BiFalco's assurance that Bobo was at his side as he and Harris talked about a second car sale; (2) the FBI's secondhand version of why there was a discrepancy in the dates on the check; and (3) the agent's statement that Harris had told him that he, Harris, had cashed the check.

In *State* v. *DeRoche,* 120 R.I. 523, 389 A.2d 1229 (1978), we discussed the constitutional limitations on the use of hearsay in probation- and parole-revocation hearings in the light of the minimum due-process requirements articulated by the holdings in *Gagnon* v. *Scarpelli,* 411 U.S. 778, 93 S. Ct. 1756, 36 L. Ed. 2d 656 (1973), and *Morrissey* v. *Brewer,* 408 U.S. 471, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972). *Morrissey* delineates one of the requirements as "the

---

[2]During their dealings with BiFalco, the FBI undercover agent purchased three cars, one of which was a Lincoln Continental. Wells had interested BiFalco in some stolen diamonds, and Harris had set up a meeting where Bobo, BiFalco, Wells, and Harris would get together and discuss matters of mutual interest. When Bobo and BiFalco failed to appear at a Providence hotel as scheduled, Harris contacted Bobo by phone. Bobo told his caller to "walk out of there" because "these guys stink in the freezer." Harris translated the "freezer" phrase to mean that Bobo "figured that they were cops." Harris left Rhode Island in June 1977.

right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." *Id.* at 489, 92 S. Ct. at 2604, 33 L. Ed. 2d at 499. In *DeRoche,* we said that the right of confrontation as it relates to the admissibility of hearsay testimony requires a determination by the trial justice whether the out-of-court declarant is available for cross-examination. If the declarant is available, the right of confrontation has been satisfied. However, should the declarant be unavailable, the trial justice must make a specific finding that there is just cause for not permitting confrontation prior to the admission of the hearsay testimony.

Assuming that the *DeRoche* standard is applicable to Bobo's violation hearing, the trial justice should have excluded evidence indicating that Bobo was with BiFalco at the time BiFalco talked with Harris, as well as the agent's attempt to explain the discrepancy in dates on the check. The agent's explanation regarding why the first sale was considered by Harris as a cash transaction was admissible, however, since Harris was available for cross-examination and, indeed, was examined by defense counsel. The trial justice's error was inconsequential because the evidence which runs afoul of the rule in *DeRoche* was merely cumulative when viewed in light of all the evidence presented at the hearing.

Bobo next argues that the trial justice erred when he allowed the FBI agent to identify one of the voices in the tape-recorded conversation as being that of Harris. This contention merits little discussion. Prior to the admission of a witness' opinion as to the identity of a speaker in a telephone conversation, it need only be established that the witness is familiar with the voice of the alleged speaker. *United States* v. *Ladd,* 527 F.2d 1341 (5th Cir. 1976); 1 Wharton, *Criminal Evidence* §189 at 373-76 (13th ed. 1972). In fact, requirements for voice authentication do not differ markedly from those employed for document authentication; once a prima facie case of authenticity is made out by the proponent of the evidence, the testimony is admissible, and the reliability of

identification presents an issue for the factfinder. *United States* v. *Albergo*, 539 F.2d 860 (2d Cir. 1976). Here, the evidence indicates that the agent was quite familiar with Harris' voice. He testified that he had spoken with Harris on numerous occasions throughout the 5-month period Harris was acting as an informant. In addition, Harris himself described the conversations he had held with the agent regarding Bobo's dealings in stolen-car activities.

■ The two tape-recorded conversations were admitted into evidence over the objection of Bobo's counsel. While there was a passing question as to the authenticity of the tapes, the main objection to the Harris-BiFalco get-together concerned its materiality, while the main objection to the Harris-Bobo conversation was that there was a lack of any authentication that the voice presumably belonging to Bobo was in fact Bobo's. Now before us Bobo claims that neither tape should have been admitted into evidence because there was no foundation laid concerning such matters as the recording device's capability to record a telephone conversation or the competency of Harris to operate the recorder.

Such a challenge merits little consideration. Of the two tapes, the one more adverse to Bobo's interests was the April 19, 1977 tape. The best proof of the authenticity of this tape was Bobo. At the hearing, he acknowledged that he had listened to this tape and that it accurately depicted the conversation he had with Harris. Harris' testimony was further proof of the tapes' authenticity. He was present when they were being made, and he identified each of the voices on the tapes as belonging to BiFalco and Bobo, respectively. Further persuasive testimony was obtained from James F. Kearney, a special agent with the Providence office of the FBI. Kearney informed the trial justice of the purpose of the tape and the fact that consent was given to the taping by Harris and his wife. He explained the operation of the tape recorder and the procedure for receiving the tapes from Harris. Kearney told the trial justice that, to the best of his knowledge, no additions or deletions had been made to the taped conversation of

April 15, 1977 and that tape, he said, had been in his custody in a safe at his Providence office. In summary, there was ample evidence that established the authenticity and accuracy of the tapes in question.[3]

Bobo also complains about the trial justice's rejection of his efforts to show how Harris deceived a Family Court justice during a proceeding which culminated in the approval of Harris' and his wife's adoption petition. The trial justice refused to admit such testimony on the grounds that it was neither material nor relevant to the violation hearing. Bobo argues at length that the Family Court episode should have been explored because it represents a graphic demonstration of Harris' complete insensitivity to the judicial process and the sanctity of the oath.

In making this argument, Bobo overlooks the fact that the trial justice was dealing with a probation-violation hearing wherein the technical rules of evidence employed during a full-blown criminal trial are not applicable. Here, the trial justice's refusal to consider Harris' conduct in the Family Court was a discretionary matter, and we see no abuse of that discretion.

Having considered all the issues raised by the rulings made by the trial justice, we would again emphasize that the evidentiary standards applicable to a probation-violation hearing are not as rigid as those applicable in a criminal trial, and the standard of proof is met by evidence which "reasonably satisfies" the trial justice that a violation has occurred. *State* v. *Turcotte*, 400 A.2d 957 (R.I. 1979); *State* v. *DeRoche*, 120 R.I. 523, 389 A.2d 1229 (1978); *State* v. *Skirvin*, 113 R.I. 443, 322 A.2d 297 (1974). There was sufficient evidence, apart from the objectionable hearsay to which we earlier alluded, which would and did reasonably satisfy the trial justice that Bobo had violated the

---

[3]Transcripts of both tapes were introduced into evidence, and the portions of conversations between Bobo and Harris and Harris and BiFalco which appear in this opinion are taken from those transcripts.

terms of his probation. We see no need to repeat the evidence properly adduced at the hearing, but there is no question that it shows Bobo as a moving force behind, and the beneficiary of, an interstate stolen-car operation whose receipts might make many a tax-paying wage earner wonder when he or she hears that "Crime does not pay."[4]

After the violation hearing had concluded, Harris appeared in the Federal District Court for the District of Rhode Island as a reluctant government witness in a case against Bobo which charged Bobo with interstate trafficking in stolen cars. Harris refused to testify on the ground that federal officials had promised him, in exchange for his cooperation, that he would not have to testify in any prosecution involving events in which he was a participant. No mention of this promise was made at the violation hearing when Harris enumerated the conditions of his cooperation with the FBI. Bobo now argues that he is entitled to a new violation hearing, since the state violated his due-process rights by deliberately suppressing any mention of that facet of the agreement between Harris and the FBI that came to light in the federal court.

In support of his contention, Bobo cites the decisions of the United States Supreme Court in *Giglio* v. *United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), and *Napue* v. *Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959), that a defendant is denied due process of law when the state knowingly uses false testimony to obtain a conviction even if the testimony goes only to the credibility of the witness. Although this basic due-process guarantee was enunciated with reference to criminal trials, it is equally applicable to probation-violation hearings wherein the defendant is afforded minimum due-process requirements. *Morrissey* v. *Brewer*, 408 U.S. 471, 92 S. Ct. 2593, 33 L. Ed.

---

[4]During the period Harris worked as an informant, he was paid $10,200. The FBI gave him a direct payment of $3,000, and a sizable portion, if not the entire balance of $7,200, came to Harris as his share of the proceeds of the stolen-car operation in which he was a participant. The FBI described Harris' retention of the proceeds as an indirect payment for services rendered.

2d 484 (1972); *Gagnon* v. *Scarpelli*, 411 U.S. 778, 93 S. Ct. 1756, 36 L. Ed. 2d 656 (1973).

Bobo's argument fails for the simple reason that it is totally unsupported by any evidence that the state knew of or was privy to all the details of the Harris-FBI understanding. This is true despite the fact that the District Court, in quashing Harris' witness subpoena, found that representatives of the federal government had promised Harris that he would not have to testify in matters such as Bobo's criminal trial. There is no evidence to indicate that this promise was equally applicable to Rhode Island's probation-violation hearing. Bobo never raised this issue at the hearing, and indeed, as noted by the trial justice in denying the motion for a new hearing, even though Harris did tell the federal court that he testified before the state court under duress, Harris continued to repeat that no promises were made to him by any Rhode Island official. In fact, he conceded that he did have a subpoena from the state police, and therefore, had to testify. Harris also made it clear that Captain Pare of the Rhode Island State Police had told him that he could not guarantee that Harris would not have to testify. Bobo's due-process argument with respect to Rhode Island's suppression of the total agreement between Harris and the FBI has no merit.

What we have just stated is equally applicable to Bobo's contention that Harris' testimony at the violation hearing was a product of coercion. There is no evidentiary basis to support that contention.

The defendant's appeal is denied and dismissed, and the judgment appealed from is affirmed.

Mr. Chief Justice Bevilacqua did not participate.

*Dennis J. Roberts II*, Attorney General, *Susan McGuirl*, Special Assistant Attorney General, for plaintiff.

*John F. Cicilline*, for defendant.