**STATE**

v.

**Raymond J. McLAUGHLIN.**

No. 2007–53–C.A.

Supreme Court of Rhode Island.

Dec. 4, 2007.

Lauren S. Zurier, Providence, for Plaintiff.

Catherine Gibran, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Chief Justice WILLIAMS, for the Court.

The defendant, Raymond J. McLaughlin (defendant), appeals from an adjudication of a probation violation on two separate underlying cases. The hearing justice ordered the defendant to serve three years of a suspended sentence imposed after a plea of *nolo contendere* to a number of charges, including felony domestic assault (P2/03–1058A), and he continued probation in a second case (P2/03–1788A), in which the defendant pled *nolo contendere* to charges involving possession of a controlled substance. For the reasons set forth herein, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

The tangled tale that brings this defendant before this Court is a melodrama of soap-operatic proportions.[1] On November 5, 2003, defendant pled *nolo contendere* in two separate cases to charges of felony domestic assault, simple domestic assault, three counts for possession of a controlled substance, and operation of a vehicle while in possession of a controlled substance. The defendant was sentenced to five years,

---

1. This melodrama is by no means the first of its kind. We are reminded of the famous boycott in Aristophanes' "Lysistrata" and the plea to Lysistrata on behalf of the desperate men of Athens, "The foremost men of Hellas, *smitten* by your *fascination,* Have brought their tangled *quarrels* here for your *sole arbitration."* Aristophanes, Lysistrata 71 (Icon 2006).

with one year to serve and four years probation on the felony domestic-assault charge, and three years suspended sentence with probation on all of the possession charges. In addition, defendant's driver's license was suspended for six months.

All the events leading to defendant's alleged probation violations grew out of his relationship with the complaining witness, Wendy Gray. Although the exact nature of the relationship between defendant and Ms. Gray is not entirely clear from the record, it is clear that their relationship became increasingly intense and troubled over a period spanning about four years. Ms. Gray met defendant when she was a student at Brown Medical School in the winter of 2002. According to Ms. Gray, she "was feeling bored and lonely and in need of excitement one night so [she] called an escort service * * *, and he's the one that they sent over." The defendant and Ms. Gray moved beyond this initial "professional" relationship and eventually began living together in a shared apartment in Cambridge, Massachusetts.[2]

At some point, the relationship between defendant and Ms. Gray started to break down, and by July 6, 2006, the relationship had degenerated beyond the point of civility. On that day, Ms. Gray called 911 and reported that defendant had come to her apartment unannounced and shouted for her while banging on her apartment door. Ms. Gray reported to the police that she feared for her safety during the incident and remained inside her apartment waiting for the police. She reported to the responding officer that defendant did not enter the apartment. According to the police report, defendant repeatedly called Ms. Gray's cell phone after the police had

arrived. The defendant continued to call even after a police officer on the scene answered the phone and instructed him to stop calling. The police officer tried to persuade defendant to meet with an officer and tell his side of the story, but he refused, stating that he was not "stupid."

Despite a suggestion that she do so, Ms. Gray did not obtain a restraining order after July 6, the date of the incident. In fact, according to Ms. Gray's testimony at the violation hearing, she saw defendant "quite a few times" after that particular incident. Ms. Gray asserted at the hearing, however, that she agreed to see defendant after the July 6 incident only because he paged her at the hospital where she worked and told her that his daughter had died. Whatever the reason, it is clear that Ms. Gray continued to communicate with defendant after the July 6 incident, both by phone and text message. Ultimately, Ms. Gray agreed to meet with defendant to discuss the purported death of his daughter.

Not surprisingly, Ms. Gray's contact with defendant after the July 6 incident continued to be less than civil. On August 17, 2006, Ms. Gray called the Cambridge Police Department to report a fight she had with defendant. According to Ms. Gray, the two agreed to meet at her apartment, but soon began to "bicker." They left the apartment to go shopping, but their bickering intensified to more serious fighting. Ms. Gray alleges that after defendant interfered with her driving she was forced to return to her apartment parking lot. At this point, Ms. Gray said she became scared of defendant and attempted to call the police. She alleges, however, that defendant tried to take her

---

**2.** Apparently Ms. Gray graduated from medical school at some point after meeting defendant.

phone, but grabbed her keys instead and fled the scene with them.

Four days later, on August 21, Ms. Gray went to the Cambridge Police Department and again reported the August 17 fight between her and defendant. Additionally, she reported that defendant called her a couple of days later and threatened to blow up her car. She showed the reporting officer a series of threatening text messages, which defendant apparently had sent over a period of days after the fight. A police officer photographed Ms. Gray's phone to capture the text messages, which later became part of the record at the hearing.

Finally, on November 26, the day before defendant's violation hearing, Ms. Gray said that she received a call from the Rhode Island Adult Correctional Institutions (ACI) from someone using a pseudonym that defendant had used with Ms. Gray in the past when he telephoned her from prison.

On August 23, 2006, the state filed a probation violation report in accordance with Rule 32(f) of the Superior Court Rules of Criminal Procedure. A violation hearing was held in the Superior Court over two days on November 27, 2006, and December 4, 2006. Ms. Gray testified at the violation hearing, as did defendant's probation officer, two detectives from the Cambridge Police Department, and a woman who was romantically involved with defendant at the time of the alleged violations.

Ms. Gray, as the complaining witness, testified at the hearing that she met defendant through an escort service while she was in medical school. She went on to testify about the breakdown of the relationship, including the unwanted visits, phone calls, and text messages as well as the fight in which defendant stole her keys and thereafter threatened to blow up her car. Finally, Ms. Gray testified to the phone call on the eve of the hearing from someone at the ACI using defendant's pseudonym. The defendant, who did not testify himself, pointed to a number of inconsistencies in Ms. Gray's account. In addition, defendant attempted to develop his theory that "she was controlling him then and she's controlling him now."

The hearing justice found Ms. Gray to be a credible witness. Taking into account Ms. Gray's testimony along with that of the Cambridge police officers, the hearing justice concluded that defendant failed to keep the peace or be of good behavior. The hearing justice ordered defendant to serve three years of a suspended sentence in the first case involving felony domestic assault, and he continued probation in the second case. The defendant timely appeals to this Court.

## II

### Analysis

The defendant makes three basic arguments. First, he argues that the hearing justice acted arbitrarily and capriciously by finding a violation considering the evidence presented at the hearing. Second, he argues that the hearing justice erred by admitting certain photographic evidence at the hearing. Finally, defendant asserts that the hearing justice erred in limiting his cross-examination of the complaining witness. As discussed below, we conclude that each of defendant's arguments lacks merit.

 "It is well settled that '[w]hen reviewing a finding of a probation violation, this Court will consider only whether the hearing justice acted arbitrarily or capriciously in finding a violation.'" *State v. Seamans,* 935 A.2d 618, 621, 2007 WL 4225805 at *2 (R.I.2007) (quoting *State v.*

*Vieira,* 883 A.2d 1146, 1148 (R.I.2005)). The state's burden at a probation violation hearing is to prove, "through reasonably satisfactory evidence, that a defendant violated one or more terms of his probation by failing to keep the peace or remain of good behavior." *Id.*

The state need not prove beyond a reasonable doubt that a defendant has committed a crime. *Seamans,* 935 A.2d at 621, 2007 WL 4225805 at *2 (citing *Vieira,* 883 A.2d at 1148). " 'The hearing justice can draw reasonable inferences from the evidence presented to determine whether the defendant violated the terms of his probation.' " *Id.* (quoting *State v. Piette,* 833 A.2d 1233, 1236 (R.I.2003)). Moreover, it is not this Court's function to weigh the credibility of witnesses; that task is for the hearing justice. *State v. Sampson,* 884 A.2d 399, 403 (R.I.2005).

The defendant first argues that the hearing justice acted arbitrarily and capriciously in finding a probation violation based on the evidence presented at the hearing. This contention is wholly without merit. The hearing justice found the state's witnesses to be credible. He further found, based on that credible evidence, that defendant violated the implied condition of his probation, to keep the peace and be of good behavior. *See State v. Znosko,* 755 A.2d 832, 834–35 (R.I.2000) (citing *State v. Godette,* 751 A.2d 742, 745 (R.I.2000)); *see also State v. Vashey,* 823 A.2d 1151, 1155–56 (R.I.2003).

The state presented credible evidence showing that defendant came to the complaining witness's apartment several times uninvited and would not leave when asked, that he physically threatened her, that he took her keys and would not return them, and that he made numerous threats by phone call or text message. The hearing justice's finding of a violation, given his credibility determinations and the evidence

presented, was in no way arbitrary or capricious. *See Vieira,* 883 A.2d at 1148.

Second, defendant contends that the hearing justice erred by admitting photographs of the complaining witness's phone depicting text messages that defendant purportedly sent. "Strict application of the rules of evidence is not required at a probation violation hearing." *State v. Rioux,* 708 A.2d 895, 898 (R.I.1998); *see also State v. Marrapese,* 122 R.I. 494, 503, 409 A.2d 544, 550 (1979). Furthermore, the admissibility *vel non* of evidence lies within the sound discretion of the hearing justice. *State v. Botelho,* 753 A.2d 343, 350 (R.I.2000).

The defendant argues that the photographs were highly prejudicial, and also that the state offered no definitive proof that defendant sent the messages. This argument likewise is without merit. The hearing justice heard testimony on this very issue from Det. Joseph Murphy, an officer with the Cambridge Police Department who took the challenged photographs. Detective Murphy, a federally trained and certified forensic computer examiner, testified that his examination of the phone revealed that the text messages had not been tampered with. Additionally, Det. Murphy testified that the messages were sent from a number that detectives had used to contact defendant. The hearing justice was well within his discretion to allow this evidence under these circumstances. *See Botelho,* 753 A.2d at 350; *Rioux,* 708 A.2d at 898.

Finally, defendant argues that the hearing justice unfairly restricted his cross-examination of the complaining witness on the subject of her motive to fabricate the allegations. Although it is true that a defendant at a violation hearing is entitled to confront and cross-examine the witnesses against him, *Vashey,* 823 A.2d at

1155, it is also true that a hearing justice may, in the exercise of his or her discretion, reasonably limit the scope of cross-examination. *State v. Caprio,* 819 A.2d 1265, 1270 (R.I.2003).

The defendant complains that he was not allowed to support his argument that the complaining witness was attempting to "control" him. The hearing justice in this case limited defendant's cross-examination of the complaining witness to issues relevant to defendant's alleged conduct. *Piette,* 833 A.2d at 1236 (hearing justice must determine whether "defendant violated the terms of his probation"). Even within the limitations set by the hearing justice, defendant was given latitude to explore the history of the parties and the volatile nature of their relationship. The hearing justice's decision to limit the scope of questioning about the complaining witness's motivations was reasonable, *see Caprio,* 819 A.2d at 1270; the only issue at the hearing was whether defendant failed to keep the peace and remain of good behavior, not the complaining witness's desire to control defendant. *See Znosko,* 755 A.2d at 834–35.

For the reasons articulated above, we conclude that the hearing justice acted neither arbitrarily nor capriciously when he found that the state presented reasonably satisfactory evidence that the defendant violated a condition of his probation.

## Conclusion

For the foregoing reasons, we affirm the judgment of the hearing justice. The record shall be remanded to the Superior Court.