**Supreme Court**

No. 2014-248-C.A.
(P2/05-2017A)
No. 2014-249-C.A.
(P2/10-2070A)
No. 2014-250-C.A.
(P2/12-416A)

|             |   |
|-------------|---|
| State       | : |
| v.          | : |
| Juan Gibson.| : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2014-248-C.A.
(P2/05-2017A)
No. 2014-249-C.A.
(P2/10-2070A)
No. 2014-250-C.A.
(P2/12-416A)

|  |  |
|---|---|
| State | : |
| v. | : |
| Juan Gibson. | : |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.** This case came before the Supreme Court on October 1, 2015, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. The defendant, Juan Gibson (Gibson or defendant), appeals from an adjudication by a justice of the Superior Court declaring him in violation of the terms and conditions of his probation. The defendant contends that the trial justice acted arbitrarily and capriciously in finding a violation. Having carefully reviewed the memoranda submitted by the parties and the arguments of counsel, we are satisfied that cause has not been shown, and the appeal may be decided at this time. We affirm the judgment of the Superior Court.

### Facts and Travel

In the early morning hours of May 19, 2013, a violent home invasion occurred at 112 Dawson Street in Pawtucket, Rhode Island. According to the description related by the

complainant, Jeffrey Lebrun (Jeffrey),[1] to the responding officers of the Pawtucket Police Department,[2] the invasion was perpetrated by two males, dressed in black and wearing ski masks. Armed with a knife, the shorter of the two perpetrators grabbed Jeffrey's neck from behind while he was sitting on his couch and began choking him. As Jeffrey struggled with his attacker for possession of the knife, the second assailant, whom Jeffrey later described as approximately five-feet-eight inches to five-feet-ten inches in height, pushed Jeffrey's head down on the couch. During this struggle, Jeffrey called out to awaken his wife, Sheri, for help. Sheri got out of bed and ran down the stairs in time to see Jeffrey struggling with one of the intruders.[3] Sheri then called 911, and the assailants fled.[4]

Shortly after Sheri's 911 call, then-Pawtucket Police Patrolman (now Sergeant) Eric Bucka (Sgt. Bucka) received a radio description of the suspects, indicating that the perpetrators were "two males dressed in all black, with masks, black sweatshirts, black pants, black shoes." Approximately one block from the crime scene, Sgt. Bucka encountered Gibson, who was wearing black sneakers, black pants, and a white shirt, but no sweatshirt. In response to Sgt. Bucka's questioning, Gibson stated that he was coming from his girlfriend's house in Attleboro, Massachusetts. After a few minutes, Sgt. Bucka and Gibson parted ways.

---

[1] To distinguish Jeffrey Lebrun from his wife, we refer to the Lebruns by their first names.

[2] By the time of defendant's probation violation hearing, Jeffrey Lebrun had died.

[3] Sheri testified that, unlike Jeffrey, she saw only one intruder.

[4] A recording of Sheri's 911 call was played for the trial justice, and both that recording and a transcript of it were admitted as full exhibits at Gibson's probation violation hearing. However, after the hearing, the exhibits were permanently withdrawn for use at future proceedings. Consequently, the record before this Court contains neither the recording of the 911 call nor the transcript of that recording.

In the aftermath of the tumultuous events at the Lebrun residence, several items attributable to the perpetrators were uncovered at the scene and in the surrounding neighborhood. Police obtained latex gloves outside of the home at 112 Dawson Street, and a backpack containing various break-in tools was found inside the dwelling. Additionally, police found the knife wielded by one of the assailants inside the home. Later that morning, Patrolman Carl Barovier (Ptlm. Barovier) was summoned to a home one and a half blocks away from the crime scene at 90 County Street, the same street on which Sgt. Bucka had stopped Gibson earlier that morning. When Ptlm. Barovier arrived, the residents informed him that, when they awoke that morning, a black sweatshirt was discovered on their lawn, inside their six-foot stockade fence. The sweatshirt was tossed back over the fence by the homeowners and was situated between the road and the fence at 90 County Street. Patrolman Barovier placed the sweatshirt into an evidence bag and returned to 112 Dawson Street to show it to the Lebruns. Both Jeffrey and Sheri confirmed that the black sweatshirt looked like the sweatshirt that one of the intruders was wearing.

All the evidence recovered by the Pawtucket Police investigators was sent to the Rhode Island Department of Health (DOH) for DNA testing.[5] Tamara Wong (Wong), a forensic biologist employed by the DOH and an expert in DNA testing, explained the results of the DNA

---

[5] The road to DNA testing of this evidence was a somewhat winding one. Shortly after the break-in in May 2013, the gloves found outside 112 Dawson Street were sent to the DOH. In July 2013, Jeffrey was murdered in his home, and, in August 2013, Pawtucket Police Detective Charles Devine (Det. Devine) was assigned to investigate both the murder and the home invasion. In connection with the investigation, Det. Devine ordered the transfer of the remaining items of evidence from the home invasion—the black sweatshirt, the knife, and the break-in tools from the backpack found at the crime scene—to the DOH. After Det. Devine learned that DNA extracted from the collar of the sweatshirt matched the DNA profile of a convicted offender named Juan A. Gibson from a DNA indexing system known as CODIS (Combined DNA Index System), he apprehended Gibson. A buccal swab was then taken from Gibson and transferred to the DOH for comparison analysis.

testing of this evidence. Wong testified that a saliva stain on the right shoulder of the black sweatshirt matched Jeffrey's DNA profile. Additionally, DNA was extracted from the collar of the sweatshirt, and this extracted DNA matched Gibson's DNA profile.[6] Wong also testified that she examined other items found at the scene—the glove and a piece of cord or clothesline found in the backpack—and that the DNA profiles were consistent with Gibson's DNA profile; she elaborated that twenty-one of the twenty-three loci in the profile found on both the glove and the piece of cord or clothesline matched Gibson's DNA profile. During questioning from Det. Devine following Gibson's apprehension in March 2014, Gibson told Det. Devine that, on the night of the home invasion, his car broke down while he was coming back from North Attleborough,[7] he was walking home, and he had to call AAA to take care of the car.

Gibson was serving suspended sentences for three separate drug convictions and was on probation as a result. First, in 2005, Gibson entered a plea of nolo contendere to possession of a controlled substance with intent to deliver and was sentenced to ten years at the Adult Correctional Institutions (ACI), two years to serve and the remaining eight years suspended, with probation.[8] Second, in 2010, Gibson entered a plea of nolo contendere to possession of cocaine and possession of marijuana, and he was sentenced to six years at the ACI, one year to serve and

---

[6] Wong testified that there is a mere one-in-fifty-six-trillion chance that the DNA from the sweatshirt collar does not belong to Gibson. On cross-examination, Wong testified that the DNA extracted from the sweatshirt collar was so-called "touch DNA," which consists of "anything that comes in contact with skin or epithelial cells that can be shedded." Wong acknowledged that the presence of Gibson's touch DNA on the sweatshirt collar did not necessarily mean that he ever wore the sweatshirt; if he simply touched the collar, his touch DNA could have transferred to the collar.

[7] Although Det. Devine remembers Gibson saying that he was coming back from North Attleborough, he acknowledged that Gibson could have said Attleboro instead.

[8] Gibson had previously been adjudicated a probation violator on this sentence; at the time of the probation violation hearing in this case, eighty-two months remained on the 2005 sentence.

five years suspended, with probation. Finally, in 2012, Gibson entered a plea of nolo contendere to possession of an enumerated quantity of cocaine and was sentenced to nine years at the ACI, eighteen months to serve and ninety months suspended, with probation. Accordingly, on March 27, 2014, the state filed, pursuant to Rule 32(f) of the Superior Court Rules of Criminal Procedure, notices of probation violation in each of these three cases. At the probation violation hearing, in addition to the evidence recounted above, Sheri testified that she knew Gibson through a friendship with his wife and that, although Gibson had been to the back porch of the Lebrun home at 112 Dawson Street, he had never been inside the residence.

After considering the evidence, the trial justice was "more than reasonably satisfied" that Gibson violated the terms and conditions of his probation. The trial justice found that two aspects of the black sweatshirt that police had recovered—and that Sheri and Jeffrey identified as similar to the sweatshirts worn by the perpetrators—were indicative of defendant's involvement in the break-in: (1) the discovery of the sweatshirt close to the crime scene, evidently discarded over a fence by one of the perpetrators; and (2) the fact that both Gibson's and Jeffrey's DNA were found on the sweatshirt. The trial justice was also "trouble[d]" that Gibson "told [Sgt.] Bucka one story and [Det.] Devine a different one." He reasoned that, if Gibson's car had broken down and he was waiting for AAA to assist him, then it was "odd" that he had not relayed these important facts to Sgt. Bucka. Although acknowledging Sheri's testimony that she saw only one intruder, the trial justice found that there were two intruders. He noted that Sheri's "911 recording makes it quite clear that she is speaking of two assailants." Additionally, the trial justice did not deem the discrepancy between Gibson's height—somewhere between six-feet-one and six-feet-two—and Jeffrey's estimation of the height of the taller intruder—approximately five-feet-eight to five-feet-ten—to be significant. He noted the approximate nature of Jeffrey's

- 5 -

estimation and reasoned that gauging an individual's height while simultaneously fending off armed home invaders is a difficult task.

The trial justice (1) ordered that the eighty-two months that remained on the suspended sentence imposed in 2005 be served at the ACI; (2) removed the five years remaining on the suspended sentence imposed in 2010 and ordered that Gibson serve that time at the ACI, concurrent with the time to be served on the 2005 sentence; and (3) ordered that the ninety-month suspended sentence imposed in 2012 be continued, with the same conditions and terms. Gibson timely appealed.

**Standard of Review**

A probation violation hearing has a singular focus: determining whether the conditions of probation—namely, "[k]eeping the peace and remaining on good behavior—have been violated." State v. Hazard, 68 A.3d 479, 499 (R.I. 2013) (quoting State v. Gromkiewicz, 43 A.3d 45, 48 (R.I. 2012)). Unlike the burden of proof at a criminal trial, the state's burden in the probation violation context is far less exacting; the state need only "prove to the reasonable satisfaction of the [trial] justice that the defendant has violated the terms and conditions of the previously imposed probation."[9] Id. (quoting Gromkiewicz, 43 A.3d at 48). We review a trial justice's adjudication of probation violation deferentially, reversing only where the trial justice "acted arbitrarily or capriciously in finding a violation." Id. (quoting Gromkiewicz, 43 A.3d at 48). Challenges to a trial justice's credibility determinations typically are unavailing in this Court because the assessment of witness credibility "in a probation violation hearing is a function of the [trial] justice, not this Court." Id. (quoting Gromkiewicz, 43 A.3d at 49).

---

[9] Consistent with the sole purpose of a probation violation hearing, the reasonable-satisfaction standard is employed to determine only whether the terms and conditions of probation were violated, not whether defendant is guilty of the offenses that form the basis of the violation allegation. See State v. Hazard, 68 A.3d 479, 499 (R.I. 2013).

- 6 -

**Analysis**

On appeal, Gibson offers several reasons why, in his view, the trial justice acted arbitrarily and capriciously in finding him to be a probation violator. None is persuasive. First, Gibson argues that the trial justice erroneously credited Jeffrey's statements that there were two perpetrators over Sheri's testimony that she saw only one. We discern no error in this regard. Jeffrey struggled with the two intruders from the outset of the home invasion, while Sheri witnessed the break-in only after Jeffrey awakened her with his calls for help. By the time Sheri arrived downstairs, one of the perpetrators may have fled, as did the assailant Sheri saw soon after she came downstairs. Additionally, in his decision, the trial justice did address Sheri's testimony that she saw only one intruder, but he noted that she referred to two perpetrators in her 911 call. Because the trial justice considered all of the evidence, accepted Jeffrey's version for plausible reasons, and rationally rejected the inference that Gibson sought to draw from Sheri's testimony that she saw only one intruder, he did not act arbitrarily or capriciously in concluding that there were two intruders. See Gromkiewicz, 43 A.3d at 49.

Gibson next claims that, because he is at least four inches taller than the taller of the two intruders that Jeffrey identified, he could not have been involved in the break-in. The trial justice considered this argument and rejected it because of the approximate nature of Jeffrey's height estimation and the difficulty in accurately pinpointing a person's height in the midst of a frantic struggle. We are satisfied that discounting the significance of the height discrepancy for the reasons articulated by the trial justice does not lead to an arbitrary or capricious conclusion.

Gibson also faults the trial justice for placing too much reliance on the DNA evidence found on the black sweatshirt and on Gibson's statements to Sgt. Bucka and Det. Devine; he contends that this evidence, although incriminating at first blush, does not establish that Gibson

was one of the intruders.  With respect to the DNA found on the sweatshirt, Gibson argues that the touch DNA "might * * * have been transferred to the sweatshirt unremarkably, and innocently, in any number of different exchanges" between Gibson and Jeffrey prior to the night of the home invasion.  Finally, with respect to his statements, Gibson contends that the statements he gave to Sgt. Bucka and Det. Devine were not inconsistent:  he was walking home from his girlfriend's house in Attleboro, as he told Sgt. Bucka, because his car broke down on his way home, as he told Det. Devine.  These contentions are unavailing.  The weight of the evidence in a probation hearing rests with the trial justice.

Gibson was found approximately one block from the crime scene shortly after the police were called, and he was wearing black pants and black sneakers and no jacket or outerwear.  However, a black sweatshirt—matching the description of the clothing worn by the suspects—was found within the same proximity of the crime scene, apparently thrown over a fence on the night of the break-in.  That sweatshirt, which matched the sweatshirts worn by the perpetrators, contained Gibson's DNA on the collar and Jeffrey's DNA on the right shoulder.  Although it is possible that there is an unremarkable and innocent explanation for how this evidence— containing both Gibson's and the victim's DNA—wound up behind a stockade fence near the crime scene, the trial justice properly rejected that speculation.  He was not required to turn a blind eye to the highly probative and incriminating nature of this evidence.  His conclusion that this evidence pointed towards Gibson's involvement in the home invasion was neither arbitrary nor capricious.  See State v. McLaughlin, 935 A.2d 938, 942 (R.I. 2007) ("The hearing justice can draw reasonable inferences from the evidence presented to determine whether the defendant violated the terms of his probation." (quoting State v. Seamans, 935 A.2d 618, 621-22 (R.I. 2007))).

The same can be said for the discrepancy between Gibson's statements to the investigating officers. He told Det. Devine that his car broke down and that he needed to call AAA. The trial justice found it "odd" that, if car failure was the true reason for Gibson's presence in the vicinity of the crime scene in the early morning hours of May 19, 2013, Gibson did not report his car troubles to Sgt. Bucka. Although one could reconcile Gibson's statements to Sgt. Bucka and Det. Devine, the trial justice's conclusion that Gibson told different stories to the two officers is reasonable. See McLaughlin, 935 A.2d at 942.

## Conclusion

For the reasons articulated above, we are of the opinion that the trial justice did not act arbitrarily or capriciously in finding that the defendant violated the terms of his probation. Accordingly, we affirm the judgment of the Superior Court.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**  State v. Juan Gibson.

**CASE NOS:**  No. 2014-248-C.A.
(P2/05-2017A)

No. 2014-249-C.A.
(P2/10-2070A)

No. 2014-250-C.A.
(P2/12-416A)

**COURT:**  Supreme Court

**DATE OPINION FILED:**  November 4, 2015

**JUSTICES:**  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**  Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**  Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Robert D. Krause

**ATTORNEYS ON APPEAL:**

For State:  Virginia M. McGinn
Department of Attorney General

For Defendant:  Lara Montecalvo
Office of the Public Defender