STATE

v.

**Darcy W. FORBES.**

No. 2006–247–C.A.

Supreme Court of Rhode Island.

June 15, 2007.

---

Christopher R. Bush, Esq., for Plaintiff.

Catherine A. Gibran, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., and GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

**OPINION**

Justice SUTTELL, for the Court.

The defendant, Darcy W. Forbes, appeals from a judgment of conviction adjudging him in violation of probation and sentencing him to serve a previously suspended thirty-three month sentence. On appeal, the defendant contends that the hearing justice's findings of fact are insufficient to support his conclusion that the defendant failed to keep the peace or remain on good behavior.

This case came before the Supreme Court for oral argument pursuant to an order directing the parties to show cause why the issues raised in this appeal should not summarily be decided. After review-

ing the record and considering the parties' written and oral submissions, we conclude that the appeal may be decided at this time without the necessity of further briefing or argument. For the reasons set forth below, we vacate the judgment of conviction and remand the case to Superior Court for further proceedings.

## Facts and Procedural History

Mr. Forbes pled *nolo contendere* on May 24, 2005, to one count of felony domestic assault and one count of felony assault. For each charge, defendant received a three-year sentence—ninety days to serve and thirty-three months suspended, with probation—to be served concurrently. Shortly thereafter, in September 2005, defendant was presented as a violator, in accordance with Rule 32(f) of the Superior Court Rules of Criminal Procedure, based upon a criminal complaint alleging that he had committed first-degree sexual assault.

A combined probation violation and bail hearing was held over three days in January 2006, at which the following evidence was adduced. The complaining witness, Darchell Gomes, testified that defendant was the father of her son and that the two had dated previously, but their relationship had ended when she learned that defendant also was dating her cousin. On September 18, 2005, she was spending the night at the home of her friend, Dawanna Crudup. Ms. Gomes said that she and some other people had been "hanging out" at the Crudup house. She said that defendant had also been at the house earlier that day, but left after only fifteen minutes.

According to Ms. Gomes, defendant returned to the Crudup house at about 11:30 p.m. and approached Ms. Gomes as she sat on the front porch engaged in a telephone conversation. When he realized she was speaking with another male, defendant took her cell phone and refused to give it back. Although she believed that defendant was only "playing around" at the time, she nevertheless went into the house to enlist the aid of Dawanna's sister to get her cell phone back. The sister, Dashonna Crudup, went out to the porch to retrieve the telephone, but returned without it, followed by defendant. Once inside the house, defendant positioned himself next to Ms. Gomes on the couch in the living room and began hugging her and telling her that he wanted the two of them to get back together. After rejecting defendant's continued advances for approximately ten minutes, she left the couch and went into Dashonna's bedroom. According to Ms. Gomes, defendant followed her into the bedroom, pushed her onto the bed, and attempted to take off her clothes. At that point, Ms. Gomes testified, Dashonna walked into the room and the activity ceased. Ms. Gomes candidly stated that she did not feel threatened by Mr. Forbes at this time, and that she "didn't take him serious because Darcy's just that kind of person."

Upon leaving Dashonna's room, Ms. Gomes and defendant returned to the living room couch, where defendant resumed his efforts to hug and kiss her. Ms. Gomes testified that when she attempted to leave the couch, defendant pulled her back by grabbing the waist of her pants. After a few minutes, defendant became angry as she resisted his advances, and he pushed her away. She went into her friend Dawanna's room, where Dawanna and Ms. Gomes's son were sleeping, and defendant followed. He closed the door and leaned against it, blocking the exit. According to Ms. Gomes, he then pulled a knife out of his pocket, held it against her stomach, and told her that if she made any noise he would kill her. Ms. Gomes testified that defendant tried to remove her

pants with one hand while he held the knife in the other, but discontinued his efforts when Dashonna attempted to enter the room. He then returned the knife to his pocket and left the room. Ms. Gomes testified that she was still not scared or concerned about Mr. Forbes, and that she thought he was just "joking around."

After the incident in Dawanna's bedroom, Ms. Gomes once again returned to the living room couch, where defendant continued his sexual advances. Ms. Gomes testified that she tried to push him off of her, but defendant became more aggressive; he grabbed her hair and told her that if she did not "give it" to him, he would "take it." As she resisted, defendant unbuttoned her pants and withdrew his knife, telling her if she screamed or continued to resist he would kill her. The defendant then pulled down her pants, unzipped his own, and penetrated her; she later testified that she was not sure whether he ejaculated.

Ms. Gomes testified that defendant then pulled up his pants, told her to "stop crying you bitch" and left the house by the back door. Ms Gomes then went into Dashonna's room and told her that defendant had just raped her. Dashonna told her sister Dawanna, who told their older brother; the brother then confronted defendant, who was still in the backyard at the time. Ms. Gomes subsequently left the Crudup home and drove with a friend to the police station. After giving her statement to the police, she went to Women and Infants Hospital for a rape examination.

In recounting the events of the evening, Ms. Gomes testified that up until the time defendant allegedly raped her, she had not been threatened by his earlier actions. Rather, she believed defendant was joking around for much of the evening. Explaining why she never woke anyone up when

defendant first pulled a knife on her, she said: "I didn't think he was serious" and that "when it comes to stuff like that I think he's all talk." She went on to say that "[h]e plays like that all the time" and admitted that she had not been scared or concerned.

Dashonna Crudup and Dawanna Crudup also testified for the state at defendant's probation-revocation hearing. Dashonna's recollection of the evening's events, however, conflicted in many instances with Ms. Gomes's account. In particular, Dashonna testified that she never saw defendant in any one of the bedrooms the entire night, and was never prevented from entering her sister's bedroom, as Ms. Gomes had testified. Dashonna also recalled that defendant and Ms. Gomes had been flirting all night, and testified that at one point she witnessed Ms. Gomes lying on the couch with her head in defendant's lap as defendant played with her hair. Ten minutes after she witnessed this scene between Ms. Gomes and defendant, Dashonna said, Ms. Gomes reported to her that she had been raped. Dawanna Crudup, who had been asleep on the night in question, also testified that Ms. Gomes woke her up and told her that she had been raped by defendant. She testified that she went outside to confront defendant, but did not "stick around for an answer."

Also testifying for the state was Officer Jonathan Kantorski of the Providence Police Department. Officer Kantorski testified that he received a radio broadcast at 12:30 a.m. on September 19, 2005, indicating that defendant was wanted for first-degree sexual assault. Responding to the call, he went to defendant's residence and found defendant sitting in the passenger seat of a vehicle. He said that as he approached the vehicle the windows were rolled down but after he asked defendant to step out of the car, defendant "proceed-

ed to roll up the windows and lock the doors." The defendant then allegedly yelled through the window "she's lying. I didn't touch her." Officer Kantorski responded by telling the driver that he would smash the windows if he did not roll them down; defendant then unlocked the doors and stepped out.

The officer placed defendant under arrest and conducted a search of his person for weapons. He recalled that he found a small folding knife in defendant's shorts pocket. Ms. Gomes later identified the knife as the one that defendant used on the night she was assaulted. On cross-examination, however, the officer retracted his statement that defendant rolled up his window after the officer told him to step out of the vehicle. Rather, he remembered that defendant rolled up the windows and locked the door as the officer approached the vehicle, but that he had not yet asked defendant to step out of the car.

The only witness that the defense presented was Dennissa "Mookie" Porter, who identified defendant as her ex-boyfriend and Ms. Gomes as her cousin. She testified that she started dating defendant in October 2004, and recalled that when Ms. Gomes discovered their relationship, she would call Ms. Porter "all the time." According to Ms. Porter, Ms. Gomes was upset that defendant was denying paternity of her son, and told Ms. Porter that she would "find some way to get back at him." Specifically, Ms. Porter recalled that Ms. Gomes told her that she would "get him locked up." On cross-examination, Ms. Porter also testified that she had told Ms. Gomes of a previous incident with defen-

dant in which he had pulled a knife on Ms. Porter, and she said that Ms. Gomes knew that defendant had gotten into trouble for that incident.

After listening to witness testimony and arguments from counsel, the hearing justice determined that defendant failed to keep the peace and be of good behavior based on the following findings:

"[(1)] [Defendant] approached a woman who he knew had threatened to make trouble for him and that she had accused him of fathering her child.

"(2) [Defendant] took [victim's] cell phone, refused to return it when she demanded it back.

"(3) [Defendant] * * * walked into the dwelling house where [victim] was * * * staying. He walked in uninvited long after the day's events were over and the party was over.

"(4) [Defendant] carried a large knife with him.

"(5) [Defendant] refused to get out of the car when he was approached by a police officer and asked to get out of the car. He knew the officer was pursuing him and refused to get out until the officer threatened to break the window."

The hearing justice then sentenced defendant to serve the entire thirty-three month previously suspended sentence. In addition, he set bail at $100,000 with surety.

On appeal,[1] defendant argues that the trial justice erred in finding him to be a violator because the evidence presented against him was "utterly incredible" and did not support the justice's ultimate findings of fact. In particular, defendant

---

1. Although defendant did not file his appeal within the twenty days provided for in Article I, Rule 4(b) of the Supreme Court Rules of Appellate Procedure, he filed a motion for extension of time within which to file his appeal, on February 28, 2006, and the motion was granted. Rule 4(b) provides that the Superior Court may extend the time for filing a notice of appeal in a criminal case for a period not exceeding thirty days beyond the appeal period and that the motion may be filed before or after the time has expired.

points out that Ms. Gomes's credibility was seriously called into question by Dashonna Crudup, who testified that she never saw defendant in any one of the bedrooms that evening. Moreover, defendant asserts that the evidence demonstrated that he was just one of many people "hanging out" at the Crudup house that evening and that Ms. Gomes admitted that she believed that defendant was joking around for most of the evening, even when he took her cell phone away and refused to give it back. Finally, defendant alleges that his possession of a small knife and his arrest "without incident," as it was described in the police incident report, do not amount to a breach of the terms of his probation.

### Standard of Review

▮▮▮▮ The sole purpose of a probation-revocation proceeding is for the hearing justice to determine whether defendant failed to keep the peace and remain on good behavior, both of which are conditions of probation. *State v. Sylvia*, 871 A.2d 954, 957 (R.I.2005). To determine whether defendant has committed such a breach, the hearing justice "weighs the evidence and assesses the credibility of the witnesses." *State v. Pena*, 791 A.2d 484, 485 (R.I.2002) (mem.). The burden of proof in a probation-revocation hearing, however, is considerably lower than in a criminal case; the state is required to show only that defendant is a violator by reasonably satisfactory evidence. *Sylvia*, 871 A.2d at 957. In reviewing a hearing justice's decision in a probation-violation proceeding, this Court is limited to considering whether the hearing justice "acted arbitrarily or capriciously in finding a violation." *Id.* (quoting *State v. Rioux*, 708 A.2d 895, 897 (R.I.1998)).

### Discussion

▮▮ Although there is ample evidence in the record that, if credible, would sup-

port a finding that defendant violated the conditions of his probation by failing to keep the peace and be of good behavior, the hearing justice pointedly avoided making any factual findings relating to the underlying charge of first-degree sexual assault. The hearing justice explained his reasoning in the following words: "The real question which we should focus on is whether or not Mr. Forbes raped Ms. Gomes. While I would be inclined to find Mr. Forbes at the very least assaulted Ms. Gomes, that's not my call. That's a call for a jury to decide at trial." Rather, the hearing justice predicated his determination on the five aforementioned findings. We are of the opinion, however, that these instances of "bad behavior," neither individually nor collectively, are sufficient to support an adjudication of probation violation.

With respect to the first three findings, the evidence is uncontradicted that Ms. Gomes and Mr. Forbes were initially teasing and "joking around" with each other. Dashonna Crudup described them as "playing around and flirting." According to Ms. Gomes's testimony, it wasn't until later that evening that defendant began to act in an aggressive manner. Moreover, there is no suggestion on the record that defendant walked into the Crudup home uninvited. On the contrary, defendant was a friend of one of the Crudup brothers, and, as Ms. Gomes herself testified, "a bunch of people" were hanging out at the Crudup house that night. We are of the opinion, therefore, that neither defendant's approach of Ms. Gomes, nor his entry into the Crudup house, nor the cell phone incident constitutes bad behavior or conduct such as would violate the conditions of defendant's probation.

▮▮ Nor do the last two findings as articulated by the hearing justice rise to

the level of a probation violation. Although the hearing justice found that defendant had on his possession a "large knife," Officer Kantorski testified that the knife he found in defendant's pocket was a "small folding knife." Moreover, the incident report indicates that the knife in question had a three-inch blade, possession of which is not illegal under G.L.1956 § 11–47–42.[2] Carrying a small pocketknife is not in and of itself behavior constituting a failure to keep the peace.

Next, the hearing justice determined that defendant failed to obey a police officer's request to get out of the vehicle until the officer threatened to break the window. On cross-examination, however, the officer admitted that, in fact, defendant had rolled up the windows and locked the door before the officer asked him to step out of the vehicle. The state contends that defendant exited the vehicle only after Officer Kantorski threatened to smash the car windows, and it asserts that defendant's behavior is akin to fleeing a police officer after a lawful stop. *See State v. Gautier,* 774 A.2d 882, 887 (R.I.2001) (holding that the defendant could have been found a probation violator for fleeing a police officer). We note, however, that, unlike *Gautier,* defendant was a passenger and not in control of the vehicle, and we also note that the incident report prepared by Officer Kantorski states that defendant was arrested "without incident."[3] Although credibility determinations are "uniquely the function of the hearing justice" at a probation-violation hearing, *State v. Rivera,* 873 A.2d 115, 118 (R.I.2005), in the present case, the hearing justice did not articulate his assessment of the witnesses' credibility.

We are of the opinion, therefore, that the hearing justice's findings of fact do not support his conclusion that defendant failed to keep the peace and be of good behavior, and thus the hearing justice acted arbitrarily in finding a violation.

■ Finally, we address the state's contention that the hearing justice's comment that "[w]hile I would be inclined to find Mr. Forbes at the very least assaulted Ms. Gomes, that's not my call" is sufficient to sustain the violation adjudication. It is not entirely clear from this comment itself that the hearing justice was in fact making such a definitive finding, much less that he was doing so to his reasonable satisfaction. Later in his bench decision the hearing justice said "[c]ertainly there is enough to be a lesser included crime such as assault with a [dangerous] weapon." This statement, however, clearly was made in the context of considering bail wherein the court is obliged to view the evidence in the light most favorable to the state, *see Fountaine v. Mullen,* 117 R.I. 262, 268, 366 A.2d 1138, 1142 (1976), and thus it cannot support the violation adjudication.

## Conclusion

Although the hearing justice correctly perceived that his role was not to determine the validity *vel non* of the first-degree sexual assault charge, he unnecessarily avoided making any factual finding concerning the defendant's conduct relative to that charge. As a consequence, he predicated the violation adjudication on

---

2. General Laws 1956 § 11–47–42(a)(1), states in part:
   "nor shall any person wear or carry concealed upon his person * * * any razor, or knife of any description having a blade of more than three (3) inches in length measuring from the end of the handle where the blade is attached to the end of the blade, or other weapon of like kind or description."

3. At oral arguments, the state conceded that defendant was never charged with resisting arrest for his allegedly violative behavior.

five significantly more benign instances of the defendant's conduct that night. After carefully reviewing the record, we are of the opinion that such findings are insufficient to support the adjudication. We therefore vacate the judgment of conviction and remand the case to Superior Court for further proceedings consistent with this opinion. In the interest of judicial economy, we direct that any new violation hearing be consolidated with the trial on the underlying sexual assault charge.