## STATE

v.

### Francis D. McCARTHY.

No. 2007–134–C.A.

Supreme Court of Rhode Island.

April 21, 2008.

Christopher R. Bush, Esq., for Plaintiff.

Catherine Gibran, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

This is an appeal by Francis D. McCarthy from an adjudication of probation violation. This case came before the Supreme Court on January 22, 2008, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the memoranda submitted by counsel and their oral arguments before us, we are satisfied that cause has not been shown. Accordingly, we shall decide the appeal at this time. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

On February 28, 2001, defendant, having pled *nolo contendere* to three counts of second-degree child molestation, was sentenced to twenty years imprisonment. The defendant was to serve three years of that sentence, and the remaining seventeen years were suspended and he was placed on probation. The conditions of probation required that defendant have no victim contact, that he engage in a sex-offender program, and that he register as

a sex offender. As a consequence of those imposed conditions, on March 29, 2001, defendant signed a document entitled "Conditions of Supervised Probation," wherein he specifically acknowledged that he was subject to the special conditions of (1) a no-contact order with respect to the victim; (2) registration as a sex offender; and (3) attendance at sex-offender counseling.

In February of 2005, defendant was arrested on a charge of having violated the conditions of his probation. The original Super. R.Crim. P. 32(f)[1] violation notice indicated that the basis for the violation charge was the allegation that defendant had driven by the home of his sex-offender counselor while informing the counseling agency by phone that he was doing so. According to that violation notice, the counselor felt threatened by defendant's conduct in driving by the counselor's house. The violation notice additionally noted the fact that a person whom defendant had been convicted of molesting resided in the Town of Barrington, in which town defendant was traveling when he drove by the counselor's house.

An amended Rule 32(f) notice of probation violation was filed after the violation hearing had begun but in time for it to be addressed by the parties to that proceeding. As summarized by the magistrate, the amended notice set forth additional alleged facts as constituting further grounds that, in the state's view, would support a determination that defendant had violated the conditions of his probation. Those additional alleged facts were: (1) defendant's failure to have kept an accurate travel log; (2) defendant's failure to have accurately reported his whereabouts to his probation officer; (3) defendant's failure to have attended sex-offender counseling sessions; and (4) the presence of a pair of female underwear in the lining of the coat that was taken from defendant when he was arrested. The violation hearing was conducted in the Superior Court on June 13, 15, and 16 of 2005.

### A

### The Testimony of Amanda

A coordinator of services for the Counseling and Psychotherapy Center, who is identified in the record only as "Amanda,"[2] was the first witness to testify. Amanda testified that defendant had been a client of the Counseling and Psychotherapy Center beginning in 2001. She testified that she interacted with defendant by phone; she added that she worked with his probation officer to secure funding for the sex-offender counseling. Amanda testified that defendant had said that he was experiencing financial difficulties in paying for the group-counseling sessions and that his attendance at counseling was sporadic. According to Amanda's testimony, defendant had been on medical leave from counseling for a period of about one year, but

---

**1.** Rule 32(f) of the Superior Court Rules of Criminal Procedure provides as follows:

"The court shall not revoke probation or revoke a suspension of sentence or impose a sentence previously deferred except after a hearing at which the defendant shall be afforded the opportunity to be present and apprised of the grounds on which such action is proposed. The defendant may be admitted to bail pending such hearing. Prior to the hearing the State shall furnish the defendant and the court with a written statement specifying the grounds upon which action is sought under this subdivision."

**2.** The Superior Court allowed Amanda to testify without her having to reveal her last name. However, her status as the coordinator of services for the Counseling and Psychotherapy Center was disclosed and is uncontested.

he did not submit documentation with respect to his medical problems. It was further Amanda's testimony that, even after defendant was granted funding for counseling, his attendance at counseling did not improve.

## B

### The "Drive By" Incident

Amanda testified that on November 16, 2004 she received a phone call at the Counseling and Psychotherapy Center from defendant, who told her that he had been asked to leave a group-counseling session on the previous evening, that he was having financial trouble, and that he, in Amanda's words, "didn't see the problem of not going to group, not paying, not doing what he was supposed to." Toward the end of their phone conversation, Amanda testified, defendant indicated to her that he was, at that very moment, driving by the home of his counselors. As she recalled that conversation in the course of testifying at the hearing, Amanda said that defendant's comment was "along the lines" of the following: "Oh, look. Isn't that nice? He must be home resting."

Amanda indicated in her testimony that it was her understanding that the home to which defendant was referring during that phone call was the home of therapists Travis and Lisa Merrell.[3] Amanda testified that she immediately advised the Merrells of the fact that defendant had driven by their house "because [Amanda] feared for their safety" and because she was "very concerned" and considered it "inappropriate" that a client knew the home address of a clinician. She testified during cross-

examination that her evaluation of the situation and her subsequent response to it at that point resulted from her perception that defendant was "aggressive" and had made statements and had written letters (to probation officer Gerald Silva as well as to herself) that she considered to be "passive aggressive."

The state called as a witness one of defendant's therapists, one Travis Merrell, a clinician who offers sex-offender treatment in affiliation with the Counseling and Psychotherapy Center. Mr. Merrell testified that he had been working as a clinician since 1997 and with sex offenders since 1999. He further testified that, when individuals are recommended to the Counseling and Psychotherapy Center by the Probation and Parole Department, such individuals are required to become clients of the center and to attend counseling there. The defendant was one such person recommended by the Probation and Parole Department, and Mr. Merrell testified that he first became acquainted with defendant in the month of July 2003.

As part of the counseling process with Mr. Merrell, defendant engaged in group drama therapy. In his testimony, Mr. Merrell described this type of therapy as follows:

"[D]rama therapy is the use of drama and theater techniques to do the same thing that people do with talk therapy. It's aimed specifically as you can get to the emotional underpinnings of their deviancy and behaviors. * * * One of the first things that a [sex offender] has to do * * * in a group is do a walk through of their offense. That consists of de-

---

3. Mr. Merrell's given name is Richard R. Merrell. He testified, however, that he uses the name "Travis" because it is "the name [he is] known by in the drama therapy community." Mr. Merrell's stated reason for his use of a different name was that, during his drama

therapy training at Lesley College, "one of the challenges * * * was to pick a name because the name you pick for yourself is more important than the one people give you and I choose Travis." He testified that he conducts drama therapy sessions using that name.

scribing what you were convicted of, the sentence and details of the crime. * * * The second step would be to address what led up to the deviant fantasy, for instance, what sparked the behavior. * * * A third step would be reenactment of the crime. * * * I mean to take the person back to the moment to describe step by step the events that occurred, how he assaulted or inappropriately touched or raped * * * a victim."

Mr. Merrell testified that defendant's attendance at counseling was "sporadic" and that "there were often gaps in his attendance based on medical difficulties * * *." Mr. Merrell acknowledged that some of those medical problems were "very serious," but he stated that he had not seen any documentation of defendant's medical problems or treatment.

Mr. Merrell testified that, from July until November of 2003, defendant had attended counseling sessions "off and on probably about half the time" and that, around November of 2003, he "lost track of" defendant until he began attending counseling again in April of 2004. Mr. Merrell testified that from April of 2004 to November of 2004 defendant's attendance at counseling was "[a]gain, irregular and when he did show up, we didn't get to do a lot of work." Mr. Merrell opined in his testimony that the lack of progress in the counseling sessions was due to defendant's "resistance, denial." He elaborated by saying that, "[i]n terms of denial, we would start to talk about the crime of conviction and he would become very angry, sometimes provocative in his behavior towards the others."

According to Mr. Merrell's testimony, his clinical relationship with defendant terminated in November of 2004. During a particular counseling session in that month, he and defendant had a disagreement after defendant "denied the seriousness of the events and he got abusive * * * and challeng[ed] and questioned [Mr. Merrell's] skills, [his] wife's skills * * *." Mr. Merrell and his wife then asked defendant to leave the session. On the following day, November 16, 2004, Mr. Merrell received a call from Amanda regarding what defendant had told her about driving by the Merrells' house; he testified that he felt that defendant was "stalking" him and that he felt threatened. Mr. Merrell testified on cross-examination that he made a report about the incident to the police in Barrington, the town where he resided and where the "drive by" incident occurred.

The defendant opted to testify at the violation hearing, and he offered his version of the "drive by" incident. In defendant's direct testimony during the hearing, he explained that he had "probably spent one third of [his] life in Barrington" and was very active in that town. The defendant testified that he had tried to speak to Amanda on the phone earlier on the day of the "drive by" incident, November 16, 2004. He testified that he had gone to visit a former neighbor of his at the YMCA in Barrington; he added that, when he did not find her there, he went to a Dunkin' Donuts coffee shop to purchase a cup of coffee. From there, defendant testified, he drove to a CVS store to peruse a copy of the Barrington Times for job advertisements due to the fact that he was considering relocating to that area. The defendant further testified that he drove from CVS to a supermarket and then to a country club to visit an old friend. The defendant testified that, upon his arrival at the club, he was shocked to learn that his old friend had died between two and a half to three years earlier.

Upset by the news of his friend's death, defendant testified that he then went to

the grounds of a local monastery and thereafter walked to Barrington Beach in order "to soak up some fresh salt air to get in [his] lungs and straighten [him] out." He testified that, when he left the beach area in his car, a UPS or Federal Express truck was blocking the route that he had intended to take; he added that, while making a detour as a result of the blockage, he noticed Mr. Merrell's car, which he recognized from group meetings. The defendant testified that he did not know prior to seeing Mr. Merrell's car that his counselors resided in Barrington; he stated that he had previously assumed that Mr. Merrell lived in Bridgewater, Massachusetts because the counselor had mentioned that town a number of times.

The defendant testified that, after seeing Mr. Merrell's car, he placed a call to Amanda, for the third time that day, from a public phone booth located on Route 114 in Warren, Rhode Island. The defendant testified that he and Amanda discussed the possibility of his resuming counseling with a different counselor. According to defendant's testimony, his statements to Amanda regarding the "drive by" incident were limited to (1) the fact that he had seen Mr. Merrell's car and (2) his observation to Amanda that many people on Mr. Merrell's street had been raking leaves that day and (3) his inference that "because everybody was raking leaves I guess he [Mr. Merrell] was resting * * *." He testified that what he said to Amanda was meant "as a friendly comment more than anything else." As for the expression "drive by," defendant stated in the course of his testimony: "I reject that term very vehemently."

With respect to the "drive by" incident, defendant's probation officer, Gerald Silva, testified that defendant admitted to him that he had driven by the Merrells' house. Mr. Silva related in his testimony that defendant had told him that he had learned that his friend had died and that he had perused the newspaper advertisements. Mr. Silva further testified that defendant participated in one more counseling session at the Counseling and Psychotherapy Center after the "drive by" incident occurred, but that "it did not go well." Mr. Silva recalled in his testimony that he then advised defendant that he "needed to get back with * * * another group or he had to find another agency to go to the counseling with."

## C

### The Underwear in the Lining of Defendant's Coat

In February of 2005, defendant was arrested for violating the conditions of his probation. After his arrest, another matter came to the attention of the state, and the state proceeded to include same as one of the additional allegations set forth in the amended notice of violation.

Richard R. Webb, a correctional officer, testified on the second day of the probation violation hearing. According to his testimony, he was working in the inmate clothing room at the Adult Correctional Institutions on February 2, 2005, the date of defendant's arrest as an alleged probation violator. Officer Webb stated that his duties that day included checking the clothing of new inmates for contraband.

Officer Webb testified that, when defendant arrived after being arrested, he retrieved from inventory a heavy outer coat, a sweater, a pair of blue pants, and a T-shirt belonging to defendant. He added that, during his search of those items of clothing for contraband, he discovered "clothing that [he] thought would be unusual and it arouse[d][his] suspicions the way it was concealed within the clothing."

Officer Webb further explained that, after gaining access to the inner part of defendant's coat through a hole in the pocket, he probed the area between the outer shell and the lining of the coat, wherein he found a pair of female underwear.[4] Officer Webb testified that he prepared a report regarding this discovery and that the underwear was placed in an evidence locker.

On cross-examination, Officer Webb testified that he works only eight hours per day and that other officers work during the other shifts. He acknowledged that, with respect to the room in which he worked, "quite a few officers * * * would have access to that room." Officer Webb further testified that, when he arrives for a shift, he generally checks the clothing of inmates who have arrived during the preceding sixteen hours.

## D

## The Defendant's Failure to Remain Current with Sex–Offender Counseling

According to the testimony of Gerald Silva, who had been defendant's probation officer since April of 2004, defendant was not actively engaged in sex-offender counseling at the time that Mr. Silva began working with him as a probation officer. Mr. Silva testified that defendant was not in compliance with the terms of his probation because of his non-attendance at sex-offender counseling. Mr. Silva further testified about discussions that he and defendant had had concerning defendant's missed appointments at sex-offender counseling; Mr. Silva testified that defendant had told him he suffered from heart prob-

lems as well as from leukemia. He further testified that defendant provided him with some medical documentation that "would substantiate his not being in counseling until approximately February of 2004." According to Mr. Silva's testimony, defendant also had told him (1) that he was not working and could not attend sex-offender counseling because he could not afford it and (2) that he was not employable because of his health problems.

Mr. Silva testified about additional documentation that he requested from defendant that defendant did not provide to him. He also asked for documentation indicating that defendant could not attend Monday night counseling sessions, but defendant did not provide any such documentation.

Mr. Silva also testified as to certain efforts he made to remedy the problem of defendant's inability to pay for his counseling sessions. He testified that he succeeded in arranging funding through the Department of Corrections, but that the approval of the funding was conditioned upon defendant's good faith effort to pay part of his debt to the counseling center. Mr. Silva testified that defendant agreed to pay a lump sum of $125 toward his outstanding debt that he owed to the counseling center; defendant also agreed to pay $10 per week toward the remaining balance. The request for funding from the Department of Corrections was granted in August of 2004 and became available to fund future counseling sessions, but from April until August of that year, defendant had not been attending sex-offender counseling. Mr. Silva testified that defendant had been suspended from counseling during that time due to his sporadic attend-

---

4. Although counsel for the state described the underwear as juvenile, the magistrate who presided at defendant's probation violation hearing described the printed underwear as "at least * * * feminine in nature," but he did not make a determination as to whether or not it was juvenile underwear.

ance. According to Mr. Silva's testimony, defendant "eventually" made the $125 payment toward his debt at the counseling center in October of 2004; Mr. Silva added that defendant thereby regained the opportunity to attend the center's counseling program. At that point, defendant proceeded to pay $10 per week until the day before the "drive by" incident.

### E

### The Superior Court's Assessment of the Foregoing

At the probation violation hearing in June of 2005, defense counsel argued that there was insufficient evidence to support a finding that defendant had violated his probation. Counsel emphasized that defendant had offered an explanation for his proximity to the Merrells' residence on November 16, 2004. Defense counsel acknowledged that both Amanda and Mr. Merrell interpreted defendant's comment about Mr. Merrell's residence as constituting "some sort of threat," and she also acknowledged that they "took it very seriously." However, while not casting any doubt on the sincerity of those subjective reactions of Amanda and Mr. Merrell, defense counsel argued that those reactions did not constitute a basis for a finding of a violation of probation.[5]

Defense counsel also argued that "[e]ven if the [c]ourt finds that [defendant] has been non-compliant with the counselors, * * * that alone is not enough to pull his probation and send him to jail." She asserted that Mr. McCarthy should be granted another opportunity to return to counseling with different counselors.

As to the discovery of underwear in defendant's coat, defense counsel asserted that that allegation did not constitute a failure to keep the peace and be of good behavior. She argued that, although defendant's possession of the underwear was not "in good taste," it was nonetheless her position that such possession did not constitute a probation violation. "That is not," defense counsel argued, "what not keeping the peace and being of good behavior means"; she then asserted that the prosecution had not met its burden of providing a sufficient evidentiary basis upon which the court could find that defendant had violated the terms of his probation.

The state, for its part, maintained that the combination of factual allegations adduced at the hearing amounted to proof of a probation violation. With respect to those allegations, counsel for the state contended as follows:

"[I]ndividually they are a lot less than they are when you add all of them up. When you add up the drive-by, when you add up the girl's underwear, when you add up his complete abrogation for any responsibility for attending the sex offender counseling, his poor progress and his abusive behavior, verbally assaultive behavior when he is at the counseling, * * * it adds up to something substantial."

After reviewing the testimony that had been brought forth during the hearing, the hearing magistrate first addressed the issue of the underwear found in defendant's overcoat. The magistrate stated that this fact, in and of itself, did not constitute "a failure to keep the peace and be of good behavior," and he said that "[i]f that was the only reason Mr. McCarthy were before the [c]ourt, the [c]ourt would have to say that I find no violation."

The magistrate next addressed the "drive by" incident, again observing that

5. With respect to the subjective reactions of Amanda and Mr. Merrell, defense counsel stated: "If they felt threatened, they have a right to but that's not what you can base this violation on."

such an incident alone would not rise to the level of a failure to keep the peace and be of good behavior.

The magistrate went on to state, however, that the combination of driving past Mr. Merrell's house a day after he was asked to leave counseling,[6] his failure to pay for counseling, and his phone call informing the counseling office that he had driven past Mr. Merrell's house "raises a serious question in any mind" about why Mr. McCarthy was in Barrington that day. The magistrate then concluded that such a combination of allegations merited a "reasonable inference that his attendance at the home of the parties certainly was an attempt to threaten these counselors * * *." The magistrate referred to the conduct as an "implied threat."

In the judgment of the magistrate, the most important aspect of Mr. McCarthy's behavior, as it related to finding him to be a violator, was his failure to remain involved with his counselor. The magistrate found that this failure, combined with the above-discussed shortcomings, rose to the level of a failure to keep the peace and be of good behavior. The magistrate concluded that the state had "satisfied [him] by a fair preponderance of the evidence" that defendant had violated the terms of his probation. After stating that he was taking into consideration defendant's age (he was sixty-nine at the time of the probation violation proceedings) and his poor health, the magistrate ruled that defendant should serve six years of the seventeen years remaining on his suspended sentence.

## II

### Standard of Review

■ The duty of a judicial officer who presides at a probation violation proceed-ing is to determine whether a defendant failed to keep the peace and remain on good behavior-both being conditions of probation. *State v. Forbes*, 925 A.2d 929, 934 (R.I.2007). The prosecution's burden of proof in a probation violation proceeding is rather low; the prosecution is required to show that "reasonably satisfactory" evidence supports the finding that a defendant has violated probation. *See id.; see also State v. Sylvia*, 871 A.2d 954, 957 (R.I.2005).

■ In reviewing a finding of a probation violation, this Court considers "only whether the hearing justice acted arbitrarily or capriciously in finding a violation." *State v. McLaughlin*, 935 A.2d 938, 941 (R.I.2007) (internal quotation marks omitted); *see also Forbes*, 925 A.2d at 934. Witness credibility and the weight of the evidence are determinations that are best made by the fact-finder. *State v. Texter*, 896 A.2d 40, 43–44 (R.I.2006).

## III

### Analysis

■ The purpose of a probation violation hearing is to determine whether a condition of the probation has been breached. *State v. Znosko*, 755 A.2d 832, 834 (R.I.2000). As we have previously observed, "[k]eeping the peace and remaining on good behavior are conditions of probation." *State v. Waite*, 813 A.2d 982, 985 (R.I.2003). In a probation violation hearing, the hearing justice weighs the evidence and assesses credibility to determine whether a defendant has breached any of the conditions of probation. *Forbes*, 925 A.2d at 934.

---

**6.** With respect to Mr. McCarthy's explanation of the "drive by" incident on November 16, 2004, the magistrate described his story as "incredible," "ridiculous," and "self-serving."

■■■■ "The state's burden at a probation violation hearing is to prove, through reasonably satisfactory evidence, that a defendant violated one or more terms of his [or her] probation by failing to keep the peace or remain of good behavior." *McLaughlin*, 935 A.2d at 942 (internal quotation marks omitted). As we have previously stated, the state's burden of proof at a probation violation hearing "is considerably lower than in a criminal case." *State v. Pompey*, 934 A.2d 210, 213 (R.I.2007) (internal quotation marks omitted). It is well settled that the prosecution in a probation violation hearing need not prove beyond a reasonable doubt that a defendant has committed a crime. *State v. Seamans*, 935 A.2d 618, 621 (R.I.2007). Also, in contrast to a criminal trial, the rules of evidence need not be strictly adhered to in probation violation hearings. *State v. Bernard*, 925 A.2d 936, 939 (R.I. 2007).

According to the decision of the magistrate who presided over this case, three allegations justified the finding that defendant had violated his probation. First, the magistrate referred to the female underwear discovered in the lining of defendant's coat. Secondly, the magistrate considered what he called the "serious question" that defendant's driving by his sex-offender counselors' house (after having been dismissed from counseling) raised; the magistrate concluded that a reasonable inference could be drawn that, by doing so, defendant intended to threaten the counselors. Finally, the magistrate dealt with the issue of defendant's failure to stay involved in sex-offender counseling.

With respect to the first allegation (the discovery of underwear in defendant's coat lining), the magistrate determined that such an allegation, in and of itself, would not rise to the level of a failure to keep the peace and be of good behavior. The magistrate stated that, if the discovery of the underwear "was the only reason Mr. McCarthy were before the [c]ourt, the [c]ourt would have to say that I find no violation."

The magistrate next considered the "drive by" incident. The magistrate straightforwardly stated that to find that this incident alone rose to the level of defendant's having failed to keep the peace and be of good behavior would constitute a "stretch" on the part of the court. The magistrate nonetheless stated that he found Mr. McCarthy's testimony about how he coincidentally drove past the Merrells' house on that day to be "reprehensible and untrue, certainly not credible."

The magistrate further determined that the combination of elements surrounding the "drive by" incident—including the "drive by itself," the temporal proximity of the incident to his having been asked to leave a counseling session due to his conduct, his failure to pay his share of the fee at that session, and the phone call he made to inform the staff of the center that he had driven by the counselors' house— "when looked at in its entirety certainly raises a serious question in any mind as to why Mr. McCarthy was where he [was] * * *."

The third allegation, which the magistrate determined to be the "most important aspect of Mr. McCarthy's violation," was his "failure * * * to stay involved and current with his counselor." The magistrate determined that Mr. McCarthy was aware that he had an obligation to remain in counseling and yet had failed to attend counseling from November of 2004 until the time of the probation violation hearing.

■■■ After reviewing the entire record, it is our judgment that the magistrate acted neither arbitrarily nor capriciously

when he determined that defendant had violated the conditions of his probation.[7] As this Court has observed, the state need not prove beyond a reasonable doubt that an alleged probation violator committed a crime; the presiding judicial officer need only be reasonably satisfied by the presented evidence that a defendant breached a condition of probation by failing to keep the peace and remain in good behavior. *See Seamans*, 935 A.2d at 623. The central issue at a probation violation hearing is whether those aspects of the probationer's conduct that are being scrutinized by the court can be said to be "lacking in the * * * good behavior expected and required by [defendant's] probationary status." *State v. Brown*, 915 A.2d 1279, 1282 (R.I.2007) (internal quotation marks omitted); *see also Hampton v. State*, 786 A.2d 375, 379 (R.I.2001).

In the case before us, the magistrate who conducted defendant's probation violation hearing discussed the evidence that had come before him, weighing the evidence and assessing the credibility of witnesses, as is required. *See Forbes*, 925 A.2d at 934. Although the magistrate noted that two of the allegations would not be sufficient, if either had been standing alone, to merit a determination that defendant had breached a condition of his probation, he nevertheless held that the three allegations combined amounted to a probation violation.

We agree with the result that the magistrate reached in his decision. The defendant had been made aware of the conditions of his probation: significantly, on March 29, 2001, he signed a "Conditions of Supervised Probation" form acknowledging the requirement that he comply with certain conditions of his probation, including attendance at sex-offender counseling. The defendant's legal arguments concerning the non-criminal nature of the underwear possession and the possible explanation for the "drive by" incident are not frivolous; but, because we agree that defendant's failure to remain current with his sex-offender counseling, of which requirement defendant was well aware when he affixed his signature to the "Conditions of Supervised Probation" document, was a patent violation of a clear term of his probation, we need not and do not address the other two allegations upon which the magistrate based his decision. Failure to cooperate with the requirement that he attend sex-offender counseling could reasonably have been found by the magistrate to be a violation of defendant's probation. We therefore cannot say that the magistrate's determination that defendant violated the terms of his probation was arbitrary or capricious.

We have observed on another occasion that "[f]or people under the specter of probation, the failure to keep the peace at all times and remain on good behavior may result in the realization of stringent penalties." *State v. Johnson*, 899 A.2d 478, 481 (R.I.2006). This is one such instance. We conclude that the magistrate in this case did not err in determining that the behavior of the defendant amounted to a failure to abide by the terms of his probation, and we therefore uphold his decision.

### Conclusion

Because we have determined that the magistrate did not act arbitrarily or capriciously in concluding that the defendant had violated a condition of his probation,

---

**7.** With respect to the state's contention on appeal that this Court is without jurisdiction to hear Mr. McCarthy's appeal, we do not deem that argument to have been sufficiently briefed for review by this Court. *See generally Wilkinson v. State Crime Laboratory Commission*, 788 A.2d 1129, 1131 n. 1 (R.I.2002).

we affirm the judgment of the Superior Court. The papers in this case may be remanded to the Superior Court.

Justice FLAHERTY, dissenting.

I respectfully dissent from the opinion of the majority in this case. In doing so, I acknowledge that this is a close case, that the bar is low with respect to the quantum of proof required to demonstrate a probation violation, and that we afford significant deference to the hearing magistrate's decision. *See State v. Waite*, 813 A.2d 982, 984–85 (R.I.2003); *State v. Pagan*, 793 A.2d 1046, 1046–47 (R.I.2002) (mem.). Nevertheless, my review of the record in this case leads me to conclude that the hearing magistrate's finding of violation was arbitrary and capricious.

There were three conditions attached to McCarthy's probation; he was to: (1) register as a sex offender, (2) abide by an order of no contact with his victim, and (3) participate in sex-offender counseling. There has been no allegation whatsoever that he failed to comply with the first two conditions. With respect to the third condition, there is no question that McCarthy's attendance was not a model of consistency. However, there was ample testimony that McCarthy encountered financial and health problems, both of which became obstacles to his attendance. There was also testimony from his probation officer that requests for medical documentation were not met with McCarthy's full cooperation.

Notably, this bumpy road initially was not considered to be serious enough to justify violating McCarthy in the minds of either of two different probation officers who supervised him. The real problem did not arise until McCarthy had been

dismissed from a particular group-therapy session, after he drove by the home of his drama therapists, Richard (a.k.a. Travis) and Elizabeth Merrell, and then told the program coordinator for the counseling agency that he was doing so. That is what sparked the notice of violation, and indeed, it is the only incident referred to in the Super. R.Crim. P. 32(f) notice that was filed on November 18, 2004. The reasons for alleging violation of McCarthy's probation were not amended to include technical noncompliance with a condition of probation—sex-offender counseling—until the hearing was to commence on June 14, 2005. At that time, in open court, the discovery of the female underwear also was added as a reason for violation.[8]

A probation-violation hearing has but one purpose—to determine whether the probationer failed to keep the peace, was not of good behavior, or otherwise breached a condition of his probation. *See State v. Forbes*, 925 A.2d 929, 934 (R.I.2007); *Waite*, 813 at 985; *State v. Znosko*, 755 A.2d 832, 834 (R.I.2000). At the conclusion of the proceeding in the Superior Court, the hearing magistrate cited three possible transgressions by McCarthy that could result in a finding of violation: (1) the "drive by" of the counselors' home, (2) the discovery of female underwear in his coat lining when he was processed at the intake center of the Adult Correctional Institutions, where he was remanded after he was presented as an alleged violator of probation, and (3) his failure to attend counseling. Although the hearing magistrate specifically found the first two incidents not to be violations, he determined that the three incidents, in combination, amounted to a probation violation.[9]

With respect to McCarthy's failure to attend counseling to the satisfaction of his

---

8. The transcript makes it clear that the violation was amended just prior to the hearing.

However, the record contains only the original Super. R.Crim. Pro. 32(f) violation notice.

9. The fact that McCarthy, a twice-convicted

probation officer, I find it troubling that before the "drive by" incident, McCarthy's lack of cooperation never occasioned the filing of a notice of violation. Equally troubling to me is the reasoning of the hearing magistrate, who combined two incidents that he specifically found not to be violations with an allegation of partial noncompliance with counseling to determine that McCarthy was a violator.

I also find the probation officers' failure to assist McCarthy in complying with the terms of his probation to be problematic. It is the function of probation counselors to work with offenders to aid them in becoming productive and law-abiding members of society. Individuals on probation have not been model citizens; indeed, that is why they are on probation and under the supervision of probation officers in the first place. Here, the evidence revealed that McCarthy enjoyed more success with his first therapist, Janice Conley, who was not a drama therapist, than he did with the Merrells. His noncompliance arose only after he was required to attend drama therapy with new counselors, and his situation was exacerbated by various financial and health obstacles. The probation officers did not work with McCarthy to overcome these obstacles and, not surprisingly, problems followed.

In summary, it is my opinion that the evidence in this case was not reasonably satisfactory to find McCarthy to be a violator of probation, and I believe that the hearing magistrate was arbitrary and capricious in finding a probation violation. I would, therefore, vacate the judgment of the Superior Court.

sex offender, had female undergarments in his possession is unsettling if not downright disturbing. It is, however, neither a violation of the law nor a breach of a condition of probation.