STATE

v.

Santo **JENSEN.**

No. 2010–334–M.P.

Supreme Court of Rhode Island.

April 10, 2012.

Jane M. McSoley, Office of the Public Defender, for State.

Catherine Gibran, Office of the Public Defender, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice ROBINSON, for the Court.

The defendant, Santo Jensen, appears before this Court pursuant to our having granted his petition for a writ of certiorari;[1] he seeks review of an adjudication of probation violation after a probation violation hearing that was held on July 6, July 7, and July 8, 2010. At the conclusion of that hearing, the defendant was found to have violated the terms and conditions of his probation, and he was sentenced to serve the seven-year suspended portion of a ten-year sentence that had been previously imposed pursuant to his conviction on one count of breaking and entering a dwelling. On appeal, the defendant contends that the hearing justice acted arbitrarily and capriciously in finding a probation violation in view of the evidence presented by the state at the hearing with respect to said alleged violation.

This case came before the Supreme Court for oral argument pursuant to an order directing the parties to appear and show cause why the issues raised in this petition should not be summarily decided. After reviewing the record and considering the written and oral submissions of the

1. The record reveals that, "[d]ue to [a] miscommunication within the Rhode Island Public Defender's Office," a notice of appeal was not filed in a timely fashion; hence, defendant filed a petition for a writ of certiorari in order to appeal the adjudication of a probation violation. This Court subsequently granted said petition. *See State v. Gonzalez*, 986 A.2d 235, 237 n. 1 (R.I.2010); *State v. Perkins*, 966 A.2d 1257, 1258 n. 1 (R.I.2009).

parties, we are satisfied that cause has not been shown and that this case may be resolved without further briefing or argument.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

On July 12, 2006, defendant entered a *nolo contendere* plea with respect to a charge of driving a motor vehicle without consent of the owner, and he was sentenced to five years of probation to run concurrently with a sentence on a prior conviction.

Subsequently, on October 3, 2007, defendant entered a *nolo contendere* plea to one count of breaking and entering a dwelling and one count of simple assault. As a consequence of that October 3, 2007 plea, the magistrate sentenced defendant to (1) ten years imprisonment, with three years to serve and seven years suspended, with probation, on the first count and (2) one year suspended, with probation, on the second count.

In June of 2010, the state, making explicit reference to the above-referenced sentences, filed notices pursuant to Rule 32(f) of the Superior Court Rules of Criminal Procedure,[2] alleging that defendant had violated the terms of the probationary sentences that had been imposed as a consequence of the 2006 offense and the 2007 breaking and entering offense. The violation notices stemmed from an alleged burglary and second-degree child molestation sexual assault in the early morning hours of May 30, 2010 in the City of Pawtucket. As previously indicated, a probation violation hearing was held over three days in July of 2010, during which hearing several witnesses testified on behalf of the prosecution.

The alleged victim of the sexual assault, Jessica,[3] who was six years old both at the time of the incident in question and at the time of the July 2010 hearing, was the first witness to testify. Jessica testified that she was in court in order to talk about "the man in the house." She clarified that statement by saying that the man had entered her bedroom while she was sleeping. She testified that she awoke because he was "shaking" her; specifically, she said that he was touching her back with his hand while he was sitting on her bed. When asked by the prosecutor whether the man had touched her on "any other part of [her] body," Jessica responded: "My vagina." Jessica stated that, while the man was touching her vagina, he was touching "under [her] clothes;" she added that he had touched her vagina on the "inside." It was also her testimony that, although the man did not say anything to her, he did put his finger to his lips and said "shh." Jessica testified that she thought that he meant "[b]e quiet" when he made that gesture. She stated that the

---

**2.** Rule 32(f) of the Superior Court Rules of Criminal Procedure provides as follows:

"The court shall not revoke probation or revoke a suspension of sentence or impose a sentence previously deferred except after a hearing at which the defendant shall be afforded the opportunity to be present and apprised of the grounds on which such action is proposed. The defendant may be admitted to bail pending such hearing. Prior to the hearing the State shall furnish the defendant and the court with a written statement specifying the grounds upon which action is sought under this subdivision."

**3.** In order to respect the privacy of the complaining witness and that of her family, we have used a pseudonym (Jessica) in referring to her. *See* G.L.1956 § 11–37–8.5.

man left the house by going out the back door.

Jessica further testified that, after the man left, she went to the bathroom and to see her mother and father, who she said were "in their room sleeping." She stated that she "had to go tell them" that "the man was in the house." She further testified that she told her parents that, when the man left her bedroom, he put "bubble gum" under her sheet. The state then introduced a photograph of bubble gum, which photograph was later marked as a full exhibit; Jessica identified the bubble gum in the photograph as being the bubble gum that the man had placed under her sheet.

Jessica next testified that, when she went to the Pawtucket police station,[4] Detective Donna Joyal had shown her some photographs; specifically, Jessica testified that Detective Joyal had shown her a picture of "the man who came in [her] house" as well as photographs of other men. She stated that, until the incident at issue, she had never previously seen the man who entered her bedroom in May of 2010. The state then introduced six photographs, which were later entered as full exhibits; the prosecutor proceeded to show each of the photographs to Jessica. As the prosecutor showed each photograph to Jessica, she would ask her whether it was a "picture of the man that was in your room?" Jessica identified the fifth photograph as being that of the man who had entered her bedroom; the fifth photograph was that of defendant. Jessica also affirmed that the six photographs shown to her during the hearing were the same photographs that she had looked at when she was at the police station. At the conclusion of her direct examination by the prosecutor, Jessica identified defendant, who was sitting in the courtroom, as the man who had been in her bedroom.

On cross-examination by defense counsel, Jessica acknowledged that she had told the police that the man in her bedroom had a mustache; her testimony at the hearing varied as to whether or not she had told the police that the man had a tattoo. Jessica further testified that, when she was at the Pawtucket police station, the police did not tell her that a photograph of the man who had been in her bedroom was going to be among the photographs that would be shown to her.

The next witness was Jessica's mother. On direct examination by the prosecution, she testified that, in the early morning hours of May 30, Jessica had come into her parents' bedroom and had said that "the man woke her up." Jessica's mother testified that when she questioned her daughter about that statement, Jessica said: "Mommy there was a black man sitting on my bed." Jessica's mother next testified that she then ran to Jessica's bedroom; she added that, after Jessica told her that the man had left gum in the bedroom, she located a package of gum on Jessica's bed. Jessica's mother then identified the package of gum in the previously mentioned photographic exhibit as being the "Dentyne Ice" gum that she had found on her daughter's bed. In response to a question by the prosecutor, Jessica's mother stated that she had not purchased that package of gum.

With respect to the identification of the man who Jessica said had entered her bedroom, Jessica's mother testified that her daughter "was very open about it;" her mother explained that, if they were driving down the street, "every black man [whom Jessica saw], she'd say, 'Mommy, that's not

---

4. Detective Donna Joyal, a witness who later in the hearing testified on behalf of the prosecution, stated that Jessica came to the Pawtucket police station on June 22, 2010.

him,' * * *." Jessica's mother also testified that, after Jessica identified the man who had been in her bedroom as being in one of the photographs shown to her at the police station, she (Jessica's mother) viewed the same photograph but did not recognize the man.

On cross-examination by defense counsel, Jessica's mother testified that, when Jessica came into her room on the night of the alleged incident, she had asked her daughter whether the man had touched her and Jessica had responded that he had not touched her. Jessica's mother further testified that Jessica had stated to the detective who came to their house on the day of the burglary that the man looked like "Will" (an approximately twenty-nine-year-old friend of one of their neighbors). She also stated that Jessica had told the detective that the man in question had a tattoo on his forearm. Lastly, Jessica's mother testified that she had taken Jessica to Hasbro Children's Hospital after the alleged May 30 incident; she stated that, after performing an examination, the doctor had concluded that "there had been no penetration, * * * [and Jessica] was intact."

Detective Donna Joyal of the Pawtucket Police Department was the next witness to testify on behalf of the prosecution. Detective Joyal testified that she had responded to Jessica's home on the morning of May 30 in order to investigate the alleged incident. Detective Joyal stated that, when she arrived at the home, she

spoke with Jessica and that the girl described the man in her bedroom as having been "a black male;" the detective also testified that Jessica told her that the man in question "had a mustache * * * going around to his chin." Detective Joyal further testified that Jessica told her that the man was wearing a short-sleeved black T-shirt and was not wearing glasses; the detective added that Jessica said that "she thought he had a tattoo on his arm." Detective Joyal testified that, at one point during her conversations[5] with Jessica on that morning, Jessica told her that the man had left a package of gum on her bed; Detective Joyal then confirmed that the photographic exhibit of gum portrayed the same gum as she had photographed "at the scene" on May 30. Detective Joyal testified that she had found the package of gum "on [Jessica's] bed in her bedroom." Detective Joyal further stated that she had also taken other photographs of Jessica's house, and she added that there were no signs of forced entry. Detective Joyal also testified that, during her second conversation with Jessica on the morning of May 30, Jessica indicated to her that "the man had touched her * * * in her private area."[6]

With respect to identifying a suspect, Detective Joyal testified that Captain Newman[7] from her department's Bureau of Criminal Investigation obtained two fingerprints from the package of gum found in Jessica's bedroom; she added that, by using those prints, it was possible to identify Santo Jensen (defendant) as a suspect.

5. Detective Joyal testified that she had spoken with Jessica on three separate occasions on the morning of May 30 due to the fact that Jessica "was getting distracted."

6. As the defendant notes in his memorandum to this Court, Jessica used motions and pointing in order to indicate to Detective Joyal that defendant had touched her vagina.

7. In the transcript of the hearing, Michael Newman is called both "Lieutenant Newman" and "Captain Newman;" the variations in title are most likely due to the fact that Michael Newman had previously been a lieutenant in the Identification Bureau—whereas, at the time of the probation violation hearing, he described himself as being a "patrol captain." For the sake of consistency, we shall refer to him as "Captain Newman."

Detective Joyal stated that she then obtained an arrest warrant for defendant and that he was brought to the police station and "processed;" that processing included photographing defendant and taking his fingerprints. Detective Joyal then proceeded to identify defendant in the courtroom as the person who had been arrested.

Detective Joyal testified that, after defendant was "processed," he was interrogated by Detectives Donti Rosciti and David Silva; Detective Joyal stated that she viewed the interrogation of defendant "on the monitor." Detective Joyal testified that Detective Rosciti "read Mr. Jensen his rights [and] he acknowledged that he understood his rights;" she further testified that defendant, when asked whether he wanted to give a statement, replied in the affirmative. Detective Joyal testified that, in giving his statement to the detectives, defendant "basically denied ever being at the house, being inside the house, having any knowledge of the house."

Detective Joyal next testified that, during the interrogation, defendant was shown two photographs—viz., a photograph of Jessica's residence and a photograph of the package of gum from her bedroom. Detective Joyal testified that, in response to being shown a photograph of Jessica's house, defendant said: "Oh, that's the house across the field from where I play football with my brother." Detective Joyal further testified that, when defendant was shown a photograph of the package of gum, he "stared at it for about 30, 40 seconds, his mouth kind of opened a little bit, and then he just looked down and shook his head." Detective Joyal stated that, before defendant was shown the photograph of the gum, he had told the detectives that he had previously purchased that brand of gum. Detective Joyal added

that the detectives informed defendant that his fingerprints were found inside the package of gum and that defendant "stated that somebody else must have put them there."

Detective Joyal further testified that, on June 22, 2010 (approximately three weeks after the alleged burglary and child molestation), Jessica met with her at the Pawtucket police station. Detective Joyal indicated that the purpose of that meeting was to review with Jessica a "photo pack," which consisted of "six different photographs of six different male subjects with a set of parameters." Detective Joyal stated that, when Jessica was shown the fifth photograph in the sequence (which depicted defendant), her response was: "That's him, that's definitely him." Detective Joyal added that Jessica was "pounding on the photograph" as she identified defendant and that she asked whether she could take the picture out to the hallway "to show her mommy and daddy." Detective Joyal further testified that, during the June 22 meeting, once Jessica had identified defendant in the photograph, she (Detective Joyal) asked the girl whether she had seen that man before; Detective Joyal testified that Jessica said that "that was the man in her bedroom." Detective Joyal further stated that Jessica told her that she had never seen that man before the incident in her bedroom. Detective Joyal's final testimony on direct examination was that it was during the June 22, 2010 interview that Jessica "indicated" to her that defendant had actually placed a finger inside of her vagina on the night of the alleged incident. (See footnote 6, supra.)

On cross-examination, Detective Joyal acknowledged that, when Jessica first described defendant on the morning of the incident, she had said that defendant had

looked like Will's friend.[8] Detective Joyal also acknowledged that Jessica's mother had described Will's friend to her as being six-feet tall, heavyset, with short black hair. Detective Joyal stated that Jessica had also initially described defendant as having a tattoo on his forearm and as having a beard or a goatee. Defense counsel then introduced an incident report, which described defendant as being twenty-two years of age, being five feet and eight inches in height, weighing 170 pounds, as being "skinny," and as having no tattoos. Detective Joyal further acknowledged that the police had never dusted Jessica's home for fingerprints.

Captain Michael Newman of the Pawtucket Police Department was the next witness for the prosecution; he testified as an expert in the field of fingerprint examinations. Captain Newman testified that he processed the package of gum called "Dentyne Ice" that had been recovered from Jessica's bed; he said that his purpose was to "try to get any and all fingerprints from that item." Captain Newman affirmed that he was able to find prints on the inside of the package of gum and that he had the opportunity to compare those prints. Captain Newman further affirmed that he compared the prints on the package of gum with the inked prints of defendant; he testified that the result of that comparison was that "it was a match." He elaborated that "there were at least 10 to 12 points that were exactly the same in comparison to each other on both;" he added that there were "no dissimilar points at all." Captain Newman affirmed that the points of comparison were conclusive as to the identify of defendant.

Detective Roy Persson[9] of the Attorney General's Bureau of Criminal Investigation, was the final witness to testify at the hearing; he testified as an expert in the field of fingerprint analysis and comparison. After testifying at length about the process of fingerprint analysis in Rhode Island, Detective Persson stated that he acted as a "second examiner" with respect to the instant case; that function entailed reviewing and comparing the latent prints with the prints of those persons on the list of candidates that had been generated. Detective Persson testified that, after reviewing at least ten other candidates for a match, he "was able to determine that no other candidates matched;" he added that he counted "ten points in common" between the latent print and the inked prints of defendant.

After Detective Persson had been cross-examined, he proceeded to explain on redirect examination that he had reviewed only ten candidates, even though the above-referenced list had contained fifty candidates. He said that he had limited his review in that manner because "if the print is of high quality, the computer is very good at submitting a candidate list and putting the proper person within the top ten candidates * * *." The detective testified that the latent print was of "a fairly good quality." After being questioned on recross-examination as to whether the latent print was a partial or complete print, Detective Persson answered that it was "considered pretty much in the core area average, more than 30 percent of the pattern area;" he then stated that "that's not considered a partial print."

---

8. The record is not clear concerning whether Jessica originally characterized the man in her room as resembling "Will" or "Will's friend."

9. Prior to being employed by The Department of Attorney General, Detective Persson was a detective with the Providence Police Department for seventeen years; therefore, we shall use that honorific title when referring to him.

After hearing closing arguments, the hearing justice reviewed the testimony and evidence presented during the hearing and found that defendant had indeed violated the terms of his probation; consequently, he sentenced defendant to serve the remaining seven years of the sentence that had been imposed as a result of his 2007 conviction for breaking and entering.[10] Thereafter, defendant filed a petition for a writ of certiorari, which was granted by this Court.

On appeal, defendant contends that the evidence presented at the hearing "did nothing but invite unfair conjecture and speculation" and that, therefore, the hearing justice acted arbitrarily and capriciously in finding a violation. The defendant rests his appeal upon two arguments: (1) that Jessica's positive identification of defendant as the perpetrator and her related testimony were unreliable; and (2) that the fingerprint evidence utilized at the hearing was of questionable probative value.

## II

### Standard of Review

At a probation violation hearing, the sole issue for the hearing justice's consideration is "whether or not the defendant has breached a condition of his or her probation by failing to keep the peace or remain on good behavior." *State v. Lancellotta*, 35 A.3d 863, 867 (R.I.2012) (internal quotation marks omitted); *see also State v. Shepard*, 33 A.3d 158, 163 (R.I. 2011); *State v. Horton*, 971 A.2d 606, 610 (R.I.2009). Moreover, at a probation violation hearing, "[t]he burden of proof on the state is much lower than that which exists

in a criminal trial—the state need only show that reasonably satisfactory evidence supports a finding that the defendant has violated his or her probation." *State v. Tetreault*, 973 A.2d 489, 491–92 (R.I.2009) (internal quotation marks omitted); *see also State v. Pona*, 13 A.3d 642, 646–47 (R.I.2011); *State v. Christodal*, 946 A.2d 811, 816 (R.I.2008).

"When a hearing justice is called upon to determine whether or not a defendant has committed a probation violation, the hearing justice is charged with weighing the evidence and assessing the credibility of the witnesses." *Horton*, 971 A.2d at 610 (internal quotation marks omitted); *see also State v. English*, 21 A.3d 403, 407 (R.I.2011); *State v. Jones*, 969 A.2d 676, 679 (R.I.2009). This Court accords deference to the credibility determinations of the hearing justice "who has had the opportunity to listen to live testimony and to observe demeanor." *Horton*, 971 A.2d at 610; *see also State v. Pitts*, 960 A.2d 240, 244 (R.I.2008). When we review the record of a hearing that has been held with respect to an alleged probation violation, our focus remains on "whether the hearing justice acted arbitrarily or capriciously in assessing the credibility of the witnesses or in finding such a violation." *Tetreault*, 973 A.2d at 492 (internal quotation marks omitted); *see also Pona*, 13 A.3d at 647; *Christodal*, 946 A.2d at 816.

## III

### Analysis

#### A

#### The Hearing Justice's Analysis

After carefully reviewing the record, we are fully satisfied that the hearing justice

---

**10.** At the hearing, defendant was found to be a violator in both the 2006 case and the 2007 case; however, since only one year remained in the sentence with respect to the 2006 case

at the time of the probation violation adjudication, that case was continued on the same sentence.

did not act arbitrarily or capriciously in assessing the credibility of the complaining witness or in adjudicating defendant to be a probation violator.

In issuing his bench decision, the hearing justice accurately set forth the legal standard which he was required to apply in determining whether or not defendant had violated the terms and conditions of his probation. With respect to the reliability of Jessica's testimony, the hearing justice candidly noted at the outset that there were "a number of inconsistencies in her testimony," and he specifically referenced the inconsistencies in Jessica's description of defendant. However, after alluding to the inconsistencies in Jessica's testimony, the hearing justice proceeded to state as follows:

"The one area that [Jessica] appeared to be very certain, however, and she did not hesitate was when she described the series of photographs and she immediately eliminated the first four photographs and then she identified the photograph of Mr. Jensen and thereafter she eliminated the next photograph in line, number six. There was no hesitation in that young lady at all. * * *

"I also had the opportunity to observe young [Jessica] when she made an in-court identification. There was no hesitation. She pointed to Mr. Jensen and indicated he was wearing a white shirt, and I know he was the only person in the courtroom that remotely resembled the individual described on that particular night. And that testimony on the issue of identification was credible."

The hearing justice also thoroughly reviewed the testimony of the expert witnesses. With respect to the fingerprint on the package of gum, the hearing justice reviewed the chain of custody concerning which Detective Joyal had testified; the hearing justice then noted that the finger-print on the package was identified as being that of defendant. The hearing justice also reviewed Detective Persson's testimony about the fingerprint; he noted that Detective Persson had found the print to be "a high quality print" and had mentioned the fact that it contained "the core area of the print." The hearing justice noted that both Detective Persson and Captain Newman testified that the latent print and defendant's inked prints matched at ten different points. In concluding his review of the expert testimony, the hearing justice stated as follows:

"I didn't see any hesitation, any evasiveness at all. All I saw was two very professional individuals testifying as to their findings. They did not appear to be embellishing, fighting or evading any of the questions on cross-examination, which was rather complete."

The hearing justice then addressed once again the issue of Jessica's credibility:

"I believe, at least I'm impressed with the credibility of young [Jessica] as to both the out-of-court identification of the photo, of the in-court identification, and I do recall the testimony of [Jessica's mother], who testified about her daughter's viewing of every individual that she came by indicating 'It's not that man, mommy,' I remember that testimony, and that's the credibility of young [Jessica's] testimony given what I observed, her forthrightness, her lack of hesitation when she testified about the identifications, as opposed to the other areas of her testimony where she was somewhat unsure * * *. She did have her confidence, I find her testimony to be credible, and if that was all there was, there would be a little less weight, but the fact that the fingerprint from the gum ultimately led to Mr. Jensen only leads the Court to give some more weight to young [Jessica's] testimony. I find the

testimony of Detective Joyal and Captain Newman and Mr. Persson to be very credible and professional."

The hearing justice concluded his bench decision by stating that he was "reasonably satisfied"[11] that defendant had not kept the peace and had not been of good behavior; the hearing justice then adjudicated defendant to be a violator of his probation.

## B

## The Defendant's Challenge to the Eyewitness Identification

The defendant attacks the reliability of eyewitness identifications in general and the eyewitness identification of defendant by Jessica in particular. He contends that Jessica's testimony was "clearly unreliable" due to her age, the brevity of the incident in her bedroom, the fact that she had just awakened from her sleep at the time of the incident, and the passage of over three weeks time between the May 30 incident and Jessica's identification of defendant's photograph at the Pawtucket police station. The defendant further argues that the hearing justice placed too much reliance on Jessica's identification despite what defendant characterizes as Jessica's "uncertainties, and the escalating, non-verbal allegations."[12] The defendant states as his "bottom line" that, although Jessica's identification "may have been confident, confidence is by no means tantamount to accuracy of recollection * * *."

■ We note that defendant attacks the "reliability" both of Jessica's testimony and her identification; however, defendant does not contend that the identification procedure utilized in identifying him was suggestive and therefore of questionable constitutional validity. Hence, we need not evaluate the reliability of that identification procedure from a constitutional perspective. *See Perry v. New Hampshire,* —— U.S. ——, ——, 132 S.Ct. 716, 730, 181 L.Ed.2d 694 (2012) ("[W]e hold that the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement.").

With respect to the relationship between reliability and credibility, we have stated as follows:

"[A] trial justice must exercise [his or] her independent judgment in evaluating the reliability of [a] witness[ ].[A] trial justice must also determine to what extent reliability affects the witnesses' credibility and what weight should be given to [his or her] testimony." *State v. Luanglath,* 749 A.2d 1, 6 (R.I.2000) (discussing, in the course of reviewing the denial of a motion for a new trial, the relationship between credibility and reliability).

Furthermore, we are mindful that "[w]e do not have the same vantage point as the presiding judge, and we are unable to assess the witness' demeanor, tone of voice, and body language. Our perspective is limited to analyzing words printed on a black and white record." *State v. Woods,* 936 A.2d 195, 198 (R.I.2007) (so stating in the context of a hearing justice's conclusions with respect to the credibility of a complaining child-witness). Therefore, we give considerable deference to the reliability and credibility determinations made by the trial justice at a probation violation hearing. *See Jones,* 969 A.2d at 679 ("[T]his Court will not 'second-guess' supportable credibility assess-

---

**11.** *See* Section II of this opinion, *supra.*

**12.** *See* footnote 6, *supra.*

ments of a hearing justice in a probation-revocation hearing." (alteration in original) (internal quotation marks omitted)).

Moreover, this Court has noted that:

"When a probation-violation inquiry turns on a determination of credibility, * * * and the hearing justice, after considering all the evidence, accepts one version of events for plausible reasons stated and rationally rejects another version, we can safely conclude that the hearing justice did not act unreasonably or arbitrarily in finding that a probation violation ha[d] occurred." *State v. Rioux*, 708 A.2d 895, 898 (R.I.1998); *see also Shepard*, 33 A.3d at 164; *State v. Gauthier*, 15 A.3d 1004, 1008 (R.I.2011).

We have also on more than one occasion acknowledged that the presence of some inconsistencies between or among utterances of a witness or witnesses at different points in time does not *ipso facto* render the testimony unworthy of belief. *See, e.g., State v. Rosario*, 35 A.3d 938, 948–49 (R.I.2012); *Shepard*, 33 A.3d at 164; *State v. Cerda*, 957 A.2d 382, 386 (R.I.2008).

After considering defendant's contentions, we remain convinced that the hearing justice in this case appropriately evaluated Jessica's testimony. The hearing justice noted that there were some inconsistencies in Jessica's testimony, yet he nevertheless credited her eyewitness identifications of defendant, particularly noting her forthrightness in making these identifications. Given the deference we accord to a hearing justice's determinations as to credibility and reliability and, taking into account the laudably meticulous manner in which the hearing justice in this case addressed the credibility and reliability issues and, after having conducted a thorough review of the record and especially the testimony of young Jessica, we see no basis for concluding that the hearing jus-

tice acted arbitrarily or capriciously in crediting her testimony.

## C

### The Fingerprint Evidence

The defendant next challenges the probative value of the fingerprint evidence presented during the probation violation hearing. The defendant argues that "[t]he probative value of fingerprint evidence depends entirely on the totality of the circumstances of each case;" he has cited reported decisions from other jurisdictions to support his assertion that, if fingerprints are found on an object that is "readily moveable and in common usage," the possibility of innocent contact with that object is too great to sustain a conviction. The defendant contends that, "[i]n order to establish identity with a fingerprint" on such an object, "the circumstances must be such that the fingerprint could have been made only at the time the crime was committed." The defendant further argues that the package of gum at issue in this case had "no direct connection with the alleged offense;" and he observes that there was no evidence dating the fingerprints or limiting the timing of the impression to the time or circumstances of the crime. The defendant concludes from the foregoing that "only by conjecture" can it be inferred that defendant was the one who left the package of gum in Jessica's bedroom. The defendant additionally contends that the "doubtful quality" of the fingerprint found on the package of gum causes Detective Persson's conclusions to be, "at best, 'fairly' reliable." In sum, defendant's contentions center on the weight of the evidence adduced at the hearing.

▮ In reviewing defendant's argument wherein he seeks reversal of the adjudication of a probation violation, we are mind-

ful that the burden of proof at a probation violation hearing is markedly lower than that which rests upon the state at a criminal trial. Notably, at a probation violation hearing, "the state need only show that reasonably satisfactory evidence supports a finding that the defendant has violated his or her probation." *Tetreault*, 973 A.2d at 491–92 (internal quotation marks omitted). Moreover, we have previously held that "circumstantial evidence, including fingerprint evidence, may be sufficient to support a conviction, * * * as long as the totality of the circumstantial evidence presented to the finder of fact constitutes proof of guilt beyond a reasonable doubt." *State v. Rodriguez*, 798 A.2d 435, 437 (R.I. 2002) (citation and internal quotation marks omitted); *see also State v. Berroa*, 6 A.3d 1095, 1103 (R.I.2010); *State v. Perkins*, 966 A.2d 1257, 1261 (R.I.2009). It follows that a probation violation adjudication may be predicated upon fingerprint evidence as long as the weight of the circumstantial evidence constitutes reasonably satisfactory evidence that the defendant has violated his or her probation.

Looking to the totality of the evidence in the instant case, it is clear that the evidence presented at the probation violation hearing more than adequately supports the conclusion that the hearing justice did not act arbitrarily or capriciously in finding that the defendant had failed to keep the peace and remain on good behavior. In view of Jessica's multiple identifications of the defendant, the defendant's fingerprint being located on the package of gum that Jessica said had been left behind by the intruder, and the defendant's admissions that he was familiar with the location of Jessica's home and that he had previously purchased Dentyne Ice gum, we are convinced that the evidence presented at the probation violation hearing unquestionably constituted reasonably satisfactory evidence that the defendant had violated his probation.

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record in this case may be returned to that tribunal.