**Supreme Court**

No. 2014-278-C.A.

(P2/09-1102A)

| | |
|---|---|
| State | : |
| v. | : |
| Michael Giard. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                             :

v.                               :

Michael Giard.                  :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Robinson, for the Court**. The defendant, Michael Giard, appeals to this Court from an adjudication of a violation of a deferred sentence. On appeal, the defendant contends that "the hearing justice acted arbitrarily and capriciously" in determining: (1) "that Mr. Giard touched [Jessica[1]] inappropriately;" and (2) "that Mr. Giard assaulted [Jessica] in reasonable proximity to April of 2010" because, in the defendant's view, neither determination was supported by the evidence in the record.

This case came before the Supreme Court for oral argument on December 7, 2016, pursuant to an order directing the parties to show cause why the issues raised in this appeal should not be summarily decided. After a close review of the record and careful consideration of the parties' arguments (both written and oral), we are satisfied that cause has not been shown and that this appeal may be decided at this time. For the reasons set forth below, we affirm the judgment of the Superior Court.

---

[1] We have employed pseudonyms in referring to the complaining witness (Jessica), her brother (Jacob), her mother (Charlene), her father (Joshua), her aunt (Lucy) (who is defendant's wife), and her cousin (Christine) (who is defendant's daughter).

# I

## Facts and Travel

On November 5, 2009, defendant pled <u>nolo</u> <u>contendere</u> to one count of felony assault[2] and received a deferred sentence[3] of five years with respect to that count. Thereafter, in April of 2010, Jessica, who is defendant's niece, told her mother and her aunt that defendant had touched her inappropriately. On May 7, 2012, defendant was presented with a notice of violation pursuant to Rule 32(f) of the Superior Court Rules of Criminal Procedure based on an alleged act of second-degree child molestation of Jessica.

In June of 2014, by agreement of the parties, a jury trial on the second-degree child molestation charge and a deferred sentence violation hearing were held simultaneously in

---

[2]    In the felony assault case that is referenced in the text, defendant was accused of sexually assaulting a fifteen-year-old girl and allegedly offering her money thereafter in exchange for her silence.

[3]    General Laws 1956 § 12-19-19, entitled "Sentencing on plea of guilty or nolo contendere—Deferment of sentence," provides in pertinent part:

> "(b) It shall be an express condition of any deferment of sentence * * * that the person agreeing to said deferment of sentence shall at all times during the period of deferment keep the peace and be of good behavior. A violation of this express condition or any other condition set forth by either the court or the written deferral agreement shall violate the terms and conditions of the deferment of sentence and the court may impose sentence.
>     "(c) If a person, after the completion of the five (5) year deferment period is determined by the court to have complied with all of the terms and conditions of the written deferral agreement, then the person shall be exonerated of the charges for which sentence was deferred * * * ."

We note that § 12-19-19 was amended in 2016. However, we have focused on the version of the statute in effect at the time the instant case was heard in Superior Court. <u>See</u> P.L. 2016, ch. 204, § 2.

Superior Court. We summarize below the salient aspects of what transpired at that trial, noting from the outset that there are widely differing accounts as to the chronology of events.[4]

**A**

**Jessica's Testimony**

The complaining witness, Jessica, testified first at trial. She stated that she was born on January 11, 2002, making her eight years old at the time when defendant allegedly molested her. She testified on cross-examination that, in 2009, her aunt Lucy (who is defendant's wife) had come to where she was then living in order to bring both her and her brother Jacob to the home that Lucy and defendant shared in Woonsocket. Jessica added that her parents, Charlene and Joshua, joined her and Jacob at that Woonsocket home some time later.

Jessica testified that the garage of defendant's Woonsocket home had been converted into a computer room; she stated that defendant would from time to time call her into the computer room and "tell [her] to sit on his lap, and [she] would get distracted watching the [video] game." With respect to the molestation, Jessica testified as follows:

> "[JESSICA]: Um, I would feel movement down in my private area.
> "[PROSECUTOR]: When you say private area, what are you talking about, [Jessica]?
> "[JESSICA]: The one below where -- below your hips.
> "[PROSECUTOR]: Okay. And, in that private area, I know it's uncomfortable. What do you use that private area to do?
> "[JESSICA]: To urinate.
> "[PROSECUTOR]: Okay. And that would be your vagina?
> "[JESSICA]: Yes.
> "[PROSECUTOR]: Okay. Now, you would feel movement, and when you said you would feel movement, where would the defendant's hands be?
> "[JESSICA]: Near my private area, one of them.

---

[4] The chronology of events is of great importance in this case in view of the fact that defendant's five-year deferred sentence was imposed on November 5, 2009. It goes without saying that said deferred sentence could not have been violated if defendant's alleged wrongful conduct occurred prior to that date.

- 3 -

"[PROSECUTOR]: One of them. So one of his hands would be on your vagina; is that right?
"[JESSICA]: Yes."

Jessica further testified that the touching occurred over her nightgown and that, after defendant had engaged in the sexual touching, he would give her one dollar, usually in quarters. When defense counsel asked why Jessica did not do anything, she replied: "I was afraid I would get yelled at [by defendant]" because of "his bad temper;" and, she indicated that, at that time, "[she] didn't know if it was wrong or right." She indicated that defendant had touched her on four previous occasions, the last incident having occurred in April of 2010.[5]

Jessica then testified that she told her cousin (Christine), who is defendant's daughter, about the alleged molestation approximately one week after the April 2010 incident; she noted that Christine ultimately "convinced [her] to tell [her] mom" about that incident. Jessica stated, "At first I thought maybe I shouldn't [tell my mom] because if she got sick" or "stress[ed]," but "then I started worrying and my cousin helped me through it." It was Jessica's testimony that thereafter, at the end of April of 2010, she told her mother and her aunt about the molestation, at which time the two women were preparing to leave for a "[g]irls' night out." Jessica stated that her disclosure to her mother and her aunt was prompted by the fact that she did not wish to remain alone with defendant at his home while her mother and aunt were away; Jessica added that she was "sick and tired of it." Although there was some discrepancy in the evidence as to just when Jessica and her family moved out of defendant's Woonsocket home, Jessica testified that she remained in Rhode Island until September of 2010, before permanently moving to Minnesota.

---

[5]    Although Jessica testified that defendant had molested her on four previous occasions, for the purposes of the present appeal we are concerned solely with the fifth and final incident that allegedly occurred in April of 2010 because the other four were alleged to have occurred before defendant's deferred sentence.

# B

## Charlene's Testimony

Jessica's mother, Charlene, testified next at trial. She stated that, at some point later than April of 2010, she and her sister (Lucy) had been planning to go to New Hampshire to visit their mother,[6] at which time Jessica asked the women not to be left alone with defendant at the house in Woonsocket. On direct examination, Charlene testified as follows:

> "[Jessica] was scared. She was crying. She said, 'I don't want you to go. I don't want you to go,' and I asked her why, and she said, 'I don't want to be alone with [defendant],' and then I asked her more about it, and then she had told me what he had done with her.
>
> "* * *
>
> "* * * And that is when [Jessica] told me he -- she -- she told me he touched her private part.
>
> "* * *
>
> "She said [defendant] had paid her money to change her dress and also that he had brought her to a room off the garage that is a computer room and made her sit there."

Charlene stated that she was "upset" and "in shock" by Jessica's statements. She testified that, shortly thereafter, she told Lucy about Jessica's disclosure; and, ultimately, she and Lucy

---

[6]     Charlene's testimony with respect to which family member she and Lucy were visiting in New Hampshire and the date of her grandmother's death were contradicted several times. On direct examination, Charlene testified that, at some point after April of 2010, she and Lucy visited their mother and, "later," their grandmother in New Hampshire; however, she denied that they had visited her grandmother on the day that Jessica revealed the molestation. Although Charlene stated on several occasions that her grandmother had been alive at the time of Jessica's disclosure, it was then her testimony that her grandmother had died on September 1, 2009. When confronted with this discrepancy in her testimony, Charlene indicated that her grandmother's death may have been "around 2010."

decided to take Jessica with them to New Hampshire.[7]  She testified that, from that day forward, she never left Jessica alone with defendant.  When asked if Charlene ever called the police in Rhode Island about the alleged molestation, she replied: "[M]y main focus was to try to move [out of Rhode Island] * * * , [but] there was problems with money * * *."  It was Charlene's testimony that, when she finally moved to Minnesota at a later date, she accompanied Jessica to visit a doctor in that state, who advised them to contact the police.

## C

### Lucy's Testimony

Lucy, defendant's wife, was the last witness to testify at trial.  She testified that, in February of 2009, Jessica and her family began residing at defendant's home in Woonsocket; she said that they did not move out of that home until October of 2010.  According to Lucy, Jessica actually disclosed the alleged molestation to her in August of 2009:[8]

> "[LUCY]:  It was in -- at the end of August, probably a couple of days, a couple of days at the end of August towards the beginning of September.
> "[DEFENSE COUNSEL]:  How do you remember it was -- sorry, what year was it?
> "[LUCY]:  2009
> "[DEFENSE COUNSEL]:  How do you remember that it was 2009, end of August?
> "[LUCY]:  It was a memorable time because my grandmother was in a nursing home dying, and we -- I received a phone call that my sister and I needed to go to the nursing home and say our final goodbyes to her.

---

[7]  Charlene noted that Lucy "didn't believe" Jessica's accusations against defendant, "hurt[ing] [Charlene's] feelings;" for that reason, Charlene and her family—including Joshua, Jacob, and Jessica—all moved to Minnesota at a later date.

[8]  If Lucy's testimony as to when Jessica's disclosure took place were found to be credible, then there could have been no violation by defendant of the conditions relative to the deferred sentence.

- 6 -

> "[DEFENSE COUNSEL]: And when did your grandmother pass away?
> "[LUCY]: September 1, 2009."

Lucy further testified that Jessica and her family had remained in the Woonsocket home which Lucy shared with defendant for approximately fourteen months after Jessica's disclosure. She noted that, during that period of time, Jessica was not allowed to be in the same room as defendant so that there would not be incidents that Jessica might report.

It was Lucy's testimony that, in February of 2011, she received a phone call from the Rhode Island Department of Children, Youth, and Families (DCYF) concerning Jessica's allegations about defendant's conduct; as a result of that phone call, she and defendant decided to live separately to ensure that DCYF would not take away their children.

## D

## The Trial and Violation Hearing

On June 25, 2014, the jury acquitted defendant of second-degree child molestation. On June 30, 2014, a hearing was held with respect to defendant's alleged violation of the conditions of the deferred sentence that had been imposed on November 5, 2009. The hearing justice preliminarily noted that he was not collaterally estopped from finding defendant to have been in violation of his deferred sentence, even though the jury had acquitted him. Thereafter, he found Jessica's testimony to be credible, commenting that she was "polite," "[a]rticulate," "[m]ature," and had a "[g]ood memory." Although the hearing justice acknowledged that there was "some confusion" as to the "chronology of events related to the incident itself and how much time transpired before [Jessica's] family moved out of [defendant's] home," he ruled that such confusion did not undermine "[Jessica's] recollection of the incident." In his bench decision, he expressly stated as follows:

> "This [c]ourt accepts [Jessica's] testimony and finds that the defendant at a time in reasonable proximity to April of 2010 called [her] to his computer room, sat her on his lap and over her clothing moved his hand over her vagina."

After hearing closing arguments from the parties, the hearing justice reviewed the testimony and evidence presented at trial and found that defendant had indeed violated the conditions of his deferred sentence. He specifically stated:

> "This [c]ourt is reasonably satisfied that this defendant by this sexual contact with [Jessica] did not keep the peace or be of good behavior as required by his probationary status. He is declared to be a violator."

Consequently, the hearing justice imposed on defendant a twenty-year sentence with five years to serve. The defendant then timely filed a notice of appeal.

## II

### Standard of Review

At the outset, we note that the standard for finding a violation of probation is the same as that relative to a violation of a deferred sentence. See State v. Plante, 109 R.I. 371, 377, 285 A.2d 395, 398 (1972). In Plante, this Court expressly stated as follows:

> "We perceive no logical reason to support such a distinction. In both cases the guilt of the convicted accused has been established, but, as an act of grace, one is given a sentence, the execution of which is suspended, while in the case of the other, the imposition of sentence is formally deferred. Both * * * are placed on probation and retention of their liberty depends on good behavior during the period of probation." Id. at 377-78, 285 A.2d at 398.

The only issue for the hearing justice to consider at a deferred sentence or probation violation hearing is whether or not a defendant "has breached a condition of his or her probation by failing to keep the peace or remain on good behavior." State v. Barrientos, 88 A.3d 1130, 1133 (R.I. 2014) (internal quotation marks omitted). Additionally, at a deferred sentence or probation

violation proceeding, "[t]he burden of proof on the state is much lower than that which exists in a criminal trial—the state need only show that reasonably satisfactory evidence supports a finding that the defendant has violated his or her probation." State v. Tetreault, 973 A.2d 489, 491-92 (R.I. 2009) (internal quotation marks omitted).[9]

In determining whether or not a defendant has committed a violation of his or her deferred sentence or probation, "the hearing justice is charged with weighing the evidence and assessing the credibility of the witnesses." State v. Horton, 971 A.2d 606, 610 (R.I. 2009) (internal quotation marks omitted); see State v. Pena, 791 A.2d 484, 485 (R.I. 2002) (mem.); see also State v. English, 21 A.3d 403, 407 (R.I. 2011). In doing so, the hearing justice may "draw reasonable inferences from the evidence presented to determine whether the defendant violated the terms of his probation." State v. McLaughlin, 935 A.2d 938, 942 (R.I. 2007). We "will not second-guess supportable credibility assessments of a hearing justice in a probation-revocation hearing." State v. Raso, 80 A.3d 33, 42 (R.I. 2013) (internal quotation marks omitted); State v. Johnson, 899 A.2d 478, 482 (R.I. 2006). Instead, "[t]his Court accords deference to the credibility determinations of the hearing justice who has had the opportunity to listen to live testimony and to observe demeanor [of the witnesses]." State v. Jensen, 40 A.3d 771, 778 (R.I. 2012) (internal quotation marks omitted).

Our review of a hearing justice's finding of a violation of a deferred sentence or of probation is "limited to determining whether the hearing justice acted arbitrarily or capriciously in assessing the credibility of the witnesses or in finding such a violation." State v. Washington,

---

[9]    In 2016, the burden of proof was amended to "a fair preponderance on the evidence;" however, that amendment has no bearing on the instant case. In re Amendments to Superior Court Rules of Criminal Procedure and Sentencing Benchmarks at 1 (R.I., filed June 21, 2016) (mem.).

42 A.3d 1265, 1271 (R.I. 2012) (internal quotation marks omitted); see also State v. Ford, 56 A.3d 463, 469 (R.I. 2012); Tetreault, 973 A.2d at 492.

## III

### Analysis

On appeal, defendant contends that "the hearing justice acted arbitrarily and capriciously" in determining: (1) "that Mr. Giard touched [Jessica] inappropriately;" and (2) "that Mr. Giard assaulted [Jessica] in reasonable proximity to April of 2010" because, in defendant's view, neither determination was supported by the evidence in the record. The defendant further argues that the hearing justice erred in finding Jessica's testimony to be credible and in overlooking inconsistencies among the testimonies of Jessica and that of her mother (Charlene) and her aunt (Lucy) with respect to chronology—specifically as to when various events took place. We are in disagreement with all of his contentions.

After thoroughly reviewing the record, we are satisfied that the hearing justice did not act arbitrarily or capriciously in assessing the credibility of the witnesses, especially Jessica, or in adjudicating defendant to be a violator of his five-year deferred sentence. As we have stated on multiple occasions, "the presiding judicial officer need only be reasonably satisfied that a defendant breached a condition of probation by failing to keep the peace or remain on good behavior." State v. Bouffard, 945 A.2d 305, 313 (R.I. 2008) (internal quotation marks omitted); see, e.g., State v. Seamans, 935 A.2d 618, 623 (R.I. 2007). It is noteworthy that we "accord[] deference to the credibility determinations of the hearing justice," Jensen, 40 A.3d at 778, because "[w]e do not have the same vantage point as [him or her], and we are unable to assess the witness' demeanor, tone of voice, and body language. Our perspective is limited to analyzing words printed on a black and white record." State v. Woods, 936 A.2d 195, 198 (R.I.

2007). Consequently, it is not the role of this Court—but instead that of the hearing justice—to assess the credibility of a witness in a probation violation hearing. See Bouffard, 945 A.2d at 311-13; see also State v. Hazard, 68 A.3d 479, 499 (R.I. 2013).

In the instant case, the hearing justice carefully reviewed and discussed the testimony of the several witnesses; he weighed the evidence and assessed the credibility of each of the witnesses, as is required. See State v. Forbes, 925 A.2d 929, 934 (R.I. 2007). He prefaced his bench ruling by stating that often, in probation violation hearings, the ultimate determination as to whether a defendant has kept the peace and been of good behavior hinges upon the hearing justice's assessment of the credibility of the various witnesses. In this regard, it should particularly be recalled that the hearing justice focused upon Jessica's in-court demeanor when making a credibility determination, stating:

> "This [c]ourt has made a careful and thorough assessment of [Jessica's] testimony that this defendant engaged in sexual contact with her when she was living in his home.
>
> "* * *
>
> "I make notations often in the margins about the demeanor and attitude and candor and memory of the witnesses that are testifying before the [c]ourt. And in this case during [Jessica's] testimony, the [c]ourt wrote the following: 'Very polite. Articulate. Mature. Good memory.'"
>
> "* * *
>
> "This [c]ourt accepts [Jessica's] testimony and finds that the defendant at a time in reasonable proximity to April of 2010 called [her] to his computer room, sat her on his lap and over her clothing moved his hand over her vagina."

Ultimately, the hearing justice found Jessica's testimony to be credible; from his vantage point, he had been able to infer from her testimony and demeanor that the last molestation

occurred in April of 2010.  After perusing the record, it is quite evident that the hearing justice had more than plausible reasons for accepting Jessica's testimony.

We are aware that there were some inconsistencies between and among the testimonies of Jessica, Charlene, and Lucy.  However, from a review of the pertinent case law, we are also mindful that we have "on more than one occasion acknowledged that the presence of some inconsistencies between or among utterances of a witness or witnesses at different points in time does not ipso facto render the testimony unworthy of belief."  Jensen, 40 A.3d at 781; see State v. Lopez, 129 A.3d 77, 85 (R.I. 2016) ("Percipient witnesses often differ concerning some details about events in which they had some degree of involvement."); see also State v. Rosario, 35 A.3d 938, 948-49 (R.I. 2012).  With respect to the testimonial inconsistencies concerning the chronology of events, the hearing justice stated "[t]hat [such] area of confusion does not undermine the remainder of [Jessica's] recollection of the [molestation] incident that occurred between her and this defendant."  In the end, we cannot say that the hearing justice's credibility determinations were based on an implausible foundation.  After reviewing all of the evidence presented at trial, he was "reasonably satisfied" that defendant had violated the conditions of his deferred sentence.

When, as in the case at bar, an inquiry as to w hether the defendant violated his deferred sentence "turns on a determination of credibility"—and, after considering all the evidence, the hearing justice "accepts one version of events for plausible reasons stated and rationally rejects another version"—we "can safely conclude that the hearing justice did not act unreasonably or arbitrarily in [assessing witness credibility and in] finding that a * * * violation [of the conditions of the defendant's deferred sentence] ha[d] occurred."  State v. Ferrara, 883 A.2d 1140, 1144 (R.I. 2005) (internal quotation marks omitted).

- 12 -

## IV

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record may be returned to that tribunal.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Michael Giard. |
| **Case Number** | SU-14-0278-C.A. (P2/09-1102A) |
| **Date Opinion Filed** | March 24, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice William P. Robinson |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Daniel A. Procaccini |
| **Attorney(s) on Appeal** | For State: <br><br> Virginia McGinn <br> Department of Attorney General <br><br> For Defendant: <br><br> Angela Yingling <br> Office of the Public Defender |